**AUTO–CHLOR SYSTEM OF MINNESOTA, INC.; Auto–Chlor System Incorporated of Denver; Auto–Chlor System of Albuquerque, Inc.; Auto–Chlor System of West Texas, Inc.; Golden Light Equipment Company; Auto–Chlor System of Jacksonville; Auto–Chlor System of Fresno, Inc.; and Auto–Chlor System of Kansas, Inc., Plaintiffs,**

**v.**

**JOHNSONDIVERSEY, a Delaware Corporation; Auto–C, LLC, a Delaware Limited Liability Company; and DLever, a/k/a and f/k/a DiverseyLever, a Delaware Corporation, Defendants.**

**No. Civ. 02–535(RHK/SRN).**

United States District Court,
D. Minnesota.

July 19, 2004.

984

Tucker K. Trautman, Nancy B. Smith, Van Aaron Hughes, Theresa K. Hankes, and Andrew J. Cosgrove, Dorsey & Whitney, LLP, Minneapolis, Minnesota, for Plaintiffs.

Scott W. Hansen and Kathleen S. Donius, Reinhart Boerner Van Deuren, SC, Milwaukee, Wisconsin, and William Killion and Craig P. Miller, Gray Plant Mooty Mooty & Bennett, Minneapolis, Minnesota, for Defendants Auto–C, LLC and JohnsonDiversey.

Alain M. Baudry, Michael C. McCarthy, and Haley N. Schaffer, Maslon Edleman Borman & Brand, LLP, Minneapolis, Minnesota, for Defendant DLever.

## MEMORANDUM OPINION AND ORDER

KYLE, District Judge.

### Introduction

Plaintiffs are eight commercial dishwashing dealers who signed Dealer Contracts with the Auto–Chlor System in the 1970s and 1980s. Defendant Auto–C, LLC, ("Auto–C"), a subsidiary of Defendant JohnsonDiversey, Inc. ("JohnsonDiversey"), now owns the Auto–Chlor System, while Defendant DiverseyLever, Inc. ("DiverseyLever"), now known as DLever, owned the Auto–Chlor System from March 1999 until May 2002. Generally, the Dealer Contracts provide Plaintiffs with exclusive territories in which to use the Auto–Chlor System's trademarks and products.

Plaintiffs' principal claims are for breach of contract. They allege that Defendants have overcharged them for parts/equipment and chemical products and have violated their exclusive territory. They also allege claims of tortious interference with performance of contract, tortious interference with prospective contractual relations, trademark law violations, unfair competition, and promissory estoppel. Several motions are now before the Court seeking dismissal of all claims. For the reasons set forth below, the Court will grant the motions in part and dismiss all of Plaintiffs' claims except: (1) Claim I (breach of contract with respect to Plaintiffs' overcharging claims); and (2) Claim II (breach of the implied covenant of good faith and fair dealing with respect to Plaintiffs' overcharging claims).

### Background

#### I. The Auto–Chlor System

In the 1930s, Tennessee businessman James Robinson developed an automated commercial dishwashing system using low-temperature water, chlorine, and other chemicals. (See Brenner Decl. Exs. 15 (Griesbeck Dep. Tr. at 34:8–11), 18 (Merrifield Dep. Tr. at 49:3–50:14).) Eventually, Robinson turned his system of "automatic chlorinization" into the Auto–Chlor System ("ACS"), a Tennessee partnership. (Id. Ex. 18 (Merrifield Dep. Tr. at 49:4–10); Cosgrove Decl. Exs. 1–7 (Dealer Contracts).)

Robinson began by installing Auto–Chlor dishwashing machines, along with Auto–Chlor dishwashing chemicals, in restaurants. (See Brenner Decl. Exs. 12 (Eastman Dep. Tr. at 34:24–35:15); 17 (Ivy Dep. Tr. at 73:8–19).) As business grew, Robinson sold Auto–Chlor products through company-owned branches and independent dealers. (See id. Ex. 13 (Fakes Dep. Tr. at 22:12–23:5, 105:9–106:10).) Robinson would sell his chemical products in a concentrate form to the branches and dealers. He kept the chemical make-up of the concentrates a secret, but provided the dealers with the formulas

and specifications to mix the concentrates with raw materials to make the final products. No dealer ever received the formula of a secret Auto–Chlor concentrate. (Brenner Decl. in Opp'n to Pls.' Mot. for Summ. J. ¶ 2, Exs. 1 (Alsup 10/29/03 Dep. Tr. at 14:23–15:25); 4 (M. Durham 7/31/03 Dep. Tr. at 33:6–36:25); 5 (Eastman 10/17/03 Dep. Tr. at 89:1–91:8); 6 (Fakes 8/14/03 Dep. Tr. at 42:1–4, 82:11–83:14, 83:20–84:6); 8 (Harding 11/20/03 Dep. Tr. at 145:24–146:13); 9 (Ivy 10/23/03 Dep. Tr. 123:5–124:23); 12 (McPhail 8/8/03 Dep. Tr. at 418:12–419:3); 13 (Merrifield 7/28/03 Dep. Tr. at 145:19–146:6); 14 (Poole 8/4/03 Dep. Tr. at 65:10–23); 15 (White/Stewart 8/28/03 Dep. Tr. at 391:13–392:3); 16 (Vertin 7/23/03 Dep. Tr. at 24:5–25:9).)

Branches and dealers sold or leased dishwashing machines to restaurant or institutional customers, serviced the equipment, and also sold related products, such as glass cleaners, hand soaps, and floor cleaners. (Cosgrove Decl. Exs. 51 (Donnell Dep. Tr. at 18:9–19:6); 60 (Ivy Dep. Tr. at 74:9–17, 76:1–4); 65 (Northcutt Dep. Tr. at 49:18–50:1).) Under Robinson, ACS treated its branches and the dealers identically (see id. Ex. 59 (Harding Dep. Tr. at 24:6–26:1)) and during his tenure, ACS sold parts and chemical concentrates at 10–15% above cost (id. Ex. 55 (Fakes Dep. Tr. at 13–14, 16)). But because Robinson "didn't want [his business] to grow any faster than he wanted it to grow," fewer than a dozen new products were created during his lifetime (Brenner Decl. Ex. 18 (Merrifield 7/28/03 Dep. Tr. at 85:24–25, 234:11–14)), and he did little promotion or advertising, (id. Exs. 8 (Alsup Dep. Tr. at 108:6–11); 18 (Merrifield 7/28/03 Dep. Tr. at 195); 21 (Poole Dep.

Tr. at 123:2–15, 126:21–127:23); 22 (Vertin 7/23/03 Dep. Tr. at 262:3–11)).

## II. The Dealer Contracts

Plaintiffs are eight ACS dealers who signed "Dealer Contracts" with ACS.[1] (Cosgrove Decl. Exs. 1–7 (Dealer Contracts).) Four signed 1971 Dealer Contracts: Auto–Chlor System Incorporated of Denver ("ACS–Denver"), Auto–Chlor System of Kansas, Inc. ("ACS–Kansas"), Golden Light Equipment Company ("Golden Light"),[2] and Auto–Chlor System of Jacksonville ("ACS–Jacksonville"). (Cosgrove Decl. Exs. 2, 4, 5.) Two signed 1981 Dealer Contracts: Auto–Chlor System of Minnesota, Inc. ("ACS–Minnesota") and Auto–Chlor System of West Texas, Inc. ("ACS–West Texas"). (Id. Exs. 6, 7.) And two signed 1984 Dealer Contracts: Auto–Chlor System of Fresno, Inc. ("ACS–Fresno") and Auto–Chlor System of Albuquerque, Inc. ("ACS–Albuquerque"). (Id. Exs. 1, 3.)

The Dealer Contracts granted each Plaintiff an exclusive territory within which to use ACS's trademarks and products. The 1971 Dealer Contract provides:

The Company hereby grants to Dealer the exclusive right to use the Registered Trademarks and Trade Names and the Company's products within the boundary limits of the area herein specifically allotted as territory, but not elsewhere, and upon terms hereafter set forth....

(Cosgrove Decl. Exs. 2, 4, 5 (1971 Dealer Contract ¶ 1).) Similar language appears in the 1981 and 1984 Dealer Contracts. (Id. Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 1).)

---

1. Four owners of ACS dealerships—the Eastmans, the Ivys, the Woods, and Macari–Alsup—have not sued Defendants. (Northcutt Decl. ¶ 13.)

2. ACS–Kansas was part of Golden Light until it was separately incorporated in 1999. ACS–Kansas does not have a Dealer Contract separate from Golden Light. (Revised Fourth Amended Comp. ("RFAC") ¶ 29; Brenner Decl. Ex. 21 (Poole Dep. Tr. at 6:17–7:12).)

In return, Plaintiffs agreed to develop business in their territory. The 1971 Dealer Contracts obligate Plaintiffs:

(a) To work and develop to the satisfaction of the Company the ... specified territory ...

(b) To faithfully and diligently serve the territory so granted and to put forth the necessary effort to secure contracts for the use and distribution of the Company's products.

(*Id.* Exs. 2, 4, 5) (1971 Dealer Contract ¶ 2.) Similar language also appears in 1981 and 1984 Dealer Contracts. (*Id.* Exs. 1, 3, 6, 7) (1981, 1984 Dealer Contracts ¶ 2.) Dealers must also "list in Dealer's local Telephone Directory", and at Dealer's expense, the name " 'AUTO–CHLOR SYSTEM.' " (*Id.* Exs. 2, 4, 5 (1971 Dealer Contracts ¶ 2(e)).) Similar language appears in the 1981 and 1984 Dealer Contracts. (*See id.* Exs. 1, 3, 6, 7) (1981, 1984 Dealer Contracts ¶ 2(f).)

For its part, ACS agreed to

[A]t its own expense, continue its research for the purpose of advancing the art and improving the industry, but the Company shall be under no obligation to manufacture or distribute any article or product discovered, improved, or made, whether patented or not, or to sell such product to Dealer except that if the Company does discover, improve, or make an article or product not now in use in the field covered by this Contract, and desires to commercially market said article or product, Dealer shall have the right to represent the Company in Dealer's Territory upon such terms as Company offers to others.

(*Id.* Exs. 2, 4, 5 (1971 Dealer Contract ¶ 11).) A nearly identical provision exists in the 1981 and 1984 Dealer Contracts. (*Id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 11).)

The Dealer Contracts also dictate the manner in which the dealers could purchase parts/equipment and chemical products from ACS for re-sale and provided that they pay royalties to ACS. The 1971 Dealer Contract provides:

3.(a) Company agrees to sell F.O.B. Memphis, Tennessee, and Dealer agrees to buy from the Company, all necessary and integral parts of apparatus, devices and basic equipment, including automatic dishwashing machines, as available, necessary to efficiently operate the Auto–Chlor System for sanitizing and cleansing eating utensils....

(b)(1) Dealer may purchase from the Company all products as offered by Company to be sold to its customers; provided, however, the Dealer will not directly or indirectly advertise, offer for sale, or sell any such products to any buyer at other than the price stipulated therefore by the Company, which price shall be established from time to time by written notice from the Company to the Dealer, taking into consideration geographic location and local conditions before establishing prices.

The Dealer agrees to pay the Company 5% of the Dealer's sales price on all such sales of Company's products to its customers and on the total income or rentals received from the Automatic dishwashing machines, and other basic equipment.

(b)(2) The Company agrees to furnish to Dealer its confidential formulas and specifications for mixing chemical products offered for sale by the Company. Any and all confidential information which shall be disclosed by the Company to the Dealer in connection with said chemical products shall be used only under this Agreement and Dealer will take all steps reasonably necessary to safeguard the secrecy of said formulas.

(c) Dealer may prepare from material purchased from any source it may se-

lect, chemical products, provided they comply with the Company's specifications; or the Dealer may purchase such chemical products from any source it may select, provided such products comply with the Company's specifications. The Dealer agrees to sell all such chemical products under the Company's Trade Names and to pay to the Company 5% of the Dealer's sales price on all such sales of chemical products to Dealer's customers.

(Cosgrove Decl. Exs. 2, 4, 5 (1971 Dealer Contract ¶ 3).)

Compared to the 1971 Dealer Contract, the 1981 and 1984 Dealer Contracts contain slightly different language:

3.(a) Company agrees to sell F.O.B. Memphis, Tennessee, and Dealer agrees to buy from the Company, *virtually at cost,* all necessary and integral parts of apparatus, devices and basic equipment, including dishwashing machines, as available, necessary to efficiently operate the Auto–Chlor System for washing and sanitizing eating utensils....

(b)(1) Dealer agrees to pay to the Company 5% of Dealer's gross income derived from the servicing or rental of the basic equipment and from the sale of all chemical products, which chemical products are manufactured by the Company and/or mixed and sold by Dealer in accordance with formulas supplied by Company....

(b)(2) The Company agrees to furnish to Dealer its confidential formulas and specifications for mixing chemical products to be offered for sale to Dealer's customers. Any and all confidential information which shall be disclosed by the Company to the Dealer in connection with said chemical products shall be used only under this Contract and Dealer will take all steps reasonably necessary to safeguard the secrecy of said formulas.

(c) Dealer may prepare these chemical products from materials purchased from any source it may select, or the Dealer may purchase such chemical products from any source it may select, provided that in all cases such products shall comply with the Company's formulas and specifications, which shall be approved in writing by Company, and further provided that Dealer shall sell all such chemical products under the Company's trade names and upon such conditions as may be prescribed by the Company. Dealer shall pay to the Company 5% of the Dealer's sales price on all such sales of chemical products to Dealer's customers....

(*Id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 3) (emphasis added).)

Each Dealer Contract forbids any additions or changes from being made and no oral agreements may be enforced:

It is mutually agreed by the parties that no addition, change or erasure of any printed portion of this Contract, except the filling in of specified blank spaces and lines, shall be valid or binding upon either party hereto and that no verbal agreements of any nature, relating to the subject matter of this Contract or to any relationship between the parties, will be considered valid or enforceable.

(Cosgrove Decl. Exs. 1–7 (Dealer Contracts ¶ 9).) The 1981 and 1984 Dealer Contracts further provide that:

[t]his Contract contains all of the agreement of the parties hereto with respect to the subject matter contained herein, and no prior agreement or understanding pertaining to any such matter shall be effective for any purpose. The terms of this Contract may not be altered or modified except upon the prior written consent of the parties hereto.

(*Id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 17).) The Dealer Contracts

also address the effect of either parties' failure to require performance of any provisions:

> Failure of either party at any time to require performance of any provisions of this Contract shall not affect the right to require full performance thereof at any time thereafter and the waiver by either party of a breach of any such provision shall not be taken or held to be a waiver of any subsequent breach thereof or as nullifying the effectiveness of such provisions.

(*Id.* Exs. 1–7 (Dealer Contracts ¶ 8).)

Finally, the Dealers are prohibited from transferring or assigning the Dealer Contracts, except upon agreement of both parties. (Cosgrove Decl. Exs. 1–7) (Dealer Contracts ¶ 4). Dealers are also prohibited from engaging "directly or indirectly . . . in the business of sanitizing or cleansing eating utensils by use of an automatic dispenser or equipment similar to the Auto–Chlor System, or by use of automatic dishwashing machines, or selling, installing or servicing such equipment or materials therefor, or to engage in a similar or competitive line of business" in the specified territory for one year after termination. (*Id.* Exs. 2, 4, 5 (1971 Dealer Contract ¶ 5(d)); *see id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contacts ¶ 5(f)).)

### III. George Griesbeck Takes Over Auto–Chlor System

After Robinson's death in 1983, control of ACS passed to Red Armistead and then, in 1991, to George Griesbeck. (Cosgrove Decl. Ex. 59 (Harding Dep. Tr. at 61:14–23); Brenner Decl. Ex. 15 (Griesbeck Dep. Tr. at 10:5–11:8).) Griesbeck placed greater emphasis on promotions and attempted to secure "chain accounts," which are accounts that would cross over multiple territories. (Brenner Decl. Ex. 13 (Fakes Dep. Tr. at 103:3–6, 104:19–105:8).) During this time, ACS also developed various new products and made some of them available to the dealers and branches in a finished form, rather than allowing them to mix and package the products locally. (Northcutt Decl. in Opp'n to Pl.'s Mot. for Summ. J. ¶ 4.) Some of these products were high-temperature warewashing products that came in an encapsulated powder, such as "Kleen Duty," "Kleen Duty Plus," "Auto–Kleen," and "Auto–Kleen Plus." (*Id.*) Others complemented the low-temperature warewashing products, such as "Soak and Shine," a solid cutlery presoak, "Pink Bead," a powder beaded dish detergent, "NuPan," a decarbonizer for pots and pans, and "746 Solid," an all-purpose cleaner. (*Id.*)

As for the pricing of ACS parts/equipment and chemicals, Griesbeck testified that prior to 1995 (when Unilever purchased ACS (*see infra* Background Part IV)) the dealers and branches paid the same prices. (*See* Cosgrove Decl. Ex. 58 (Griesbeck Dep. Tr. at 54:7–24).) During Griesbeck's tenure, the prices of dishwashers, parts, and chemical concentrates for dealers "were increased somewhat more aggressively and in some cases perhaps arbitrarily to improve the bottom line." (*Id.* Ex. 55 (Fakes Dep. Tr. at 36).) Plaintiffs noticed the price increases almost immediately after Griesbeck took over. Robert Merrifield of ACS–Albuquerque and ACS–Fresno testified:

> Q. . . . [W]hen is it that you think the prices went up so as to create a problem for you?
>
> A. I can't give you an exact date, but I would say somewhere in the early '90s when the prices of the parts went up, the prices and the amount of concentrates, the number of concentrates, started to escalate and the prices started to increase. And I believe, as well as many other people believe—and we've discussed it, other dealers—that that

was the point when George Griesbeck decided that he wanted to enhance the profit of the company that he was hired to sell, and to make that happen, he made—he forgot about virtually at cost and decided to make profit centers out of the parts, the machines, and the concentrates, whereas Mr. Robinson had been satisfied....

Q. And you believe that started in the early '90s, or did it start as soon as George Griesbeck was hired?

A. As I said before, I firmly believe that he was hired for the purpose of selling it, but it took him a couple years to—you know, to set his plan in direction. And I'm in the process right now of reviewing parts price increases from 1990 to 2003, and my—again, I'm just in the process of doing this, but I see a remarkable increase in prices in '91, '92. So it—it puts a little credence to my theory.

(Brenner Decl. Ex. 18 (Merrifield 7/28/03 Dep. Tr. at 166:9–25, 167:16–168:2); *see also* Cosgrove Decl. Ex. 59 (Harding Dep. Tr. at 40:12–41:5).) Robert Durham of ACS–Jacksonville and Diane White of ACS–Denver complained about the price increases. (Brenner Decl. Exs. 11 (R. Durham 12/1/03 Dep. Tr. at 357:14–358:19); 23 (White/Stewart 8/28/03 Dep. Tr. at 367:4–369:5).)

### IV. Unilever Acquires Auto–Chlor System

After a period of stability, ACS went through a series of acquisitions beginning in 1995. In 1995, ACS was purchased by Indopco, Inc., a wholly-owned subsidiary of Unilever United States, Inc. ("Unilever"). (Strickland Decl. ¶ 2, Ex. A.) Prior to the acquisition, Griesbeck convened a dealer meeting where he informed the dealers

that "they would benefit from global recognition, advertising, and being able to get the benefits of [Unilever's] marketing department." (Cosgrove Decl. Ex. 59 (Harding Dep. Tr. at 44:17–19).) In a "Merger Information Packet," the dealers were told that they could expect "to gain significant new business ... as a result of new products and services" and "[g]reatly improved sales and marketing ... support" in key areas such as research and development and national accounts. (*Id.* Ex. 14 at 2, 4.) As a result of the acquisition, the dealers had the opportunity to sell certain Unilever products. (*See* Brenner Decl. Exs. 8 (Alsup Dep. Tr. at 54:8–25); 11 (R. Durham 7/31/03 Dep. Tr. at 19:8–21:1, 24:3–10, 30:15–32:18, 50:5–25); 16 (Innes Dep. Tr. at 17:1–22); 19 (McPhail 8/8/03 Dep. Tr. at 323:14–17).) In addition, during 1995 through 2002, several new products were introduced, including floor care products, stain removers, and bathroom cleaners. (Innes. Decl. in Opp'n to Pl.'s Mot. for Summ. J. ¶ 3.)

### V. Unilever Acquires Diversey and Americlean

In 1996, Unilever purchased all of Diversey, Inc., except for its institutional business in the United States (later known as Americlean Systems, Inc.) ("Americlean"), and formed DiverseyLever, Inc. In an August 1996 letter announcing that ACS was to be part of DiverseyLever, Griesbeck told dealers that the new DiverseyLever name "does not impact Auto–Chlor System," that ACS would "continue to operate as always," and that ACS dealers would benefit from DiverseyLever's global organization. (Cosgrove Decl. Ex. 15.)

In 1998, Conopco [3] purchased Americlean. (Northcutt Decl. ¶ 19, Ex. D.) Ameri-

---

**3.** In 1997, Indopco sold ACS to Conopco, Inc., another wholly-owned subsidiary of Uni-

lever. (Strickland Decl. ¶ 4, Ex. B.)

clean sold products similar to ACS's products in Plaintiffs' territories. (Cosgrove Decl. Exs. 50 (Chapman Dep. Tr. at 34); 54 (Eastman Dep. Tr. at 166); 66 (Poole Dep. Tr. at 75:12–24).) At a fall 1998 dealer meeting, dealers expressed their concerns to Griesbeck, among others, about what the Americlean acquisition would mean to them. (*Id.* Ex. 18.) In December 1998, following the fall meeting, Griesbeck wrote a letter to the dealers in which he said that "[w]e believe the acquisition of further selected major chain accounts will be of benefit." (*Id.* Ex. 21, ¶ 5.)

In that letter, Griesbeck also proposed a "cooperative approach" between Americlean and ACS. (*Id.* Ex. 21, ¶¶ 1, 4.) Under this approach, if Americlean targeted an ACS account, ACS's parts/equipment and chemical products would not be exchanged for Americlean's. (*Id.*) Similarly, if ACS targeted an Americlean account, Americlean's parts/equipment and chemical products would not be exchanged for ACS's. (*Id.* Ex. 21, ¶ 1.) If a dealer did not want to participate fully in this "cooperative mode," it could "cooperate in those areas where it makes sense and compete only as a last resort in the rest" or "continue to operate in the same mode as prior to the acquisition of Americlean by Unilever." (*Id.* Ex. 21, ¶ 4.) Some of the dealers followed this plan, and some did not. (Brenner Supp. Decl. ¶ 18, Ex. 3 (Poole 8/4/03 Dep. Tr. at 180–81); *id.* ¶ 18, Ex. 5 (R. Durham 8/1/03 Dep. Tr. at 199:12–19); *id.* ¶ 18, Ex. 8 (McPhail 8/3/03 Dep. Tr. at 309:6–310:3); Cosgrove Decl. Ex. 72 (White/Stewart 8/27/03 Dep. Tr. at 272:17–20, 277:12–16).)

## VI. Auto–Chlor System Assigned To, and Americlean Merged With, DiverseyLever

In 1999, Conopco assigned ACS to DiverseyLever. (Strickland Decl. ¶ 5, Ex. C.) At the same time, Americlean merged with DiverseyLever. (*Id.*) From March 1999 to May 2002, ACS and Americlean operated as separate divisions of DiverseyLever. (Northcutt Decl. ¶ 17.) After the 1999 assignment to DiverseyLever, the dealers were given the opportunity to sell DiverseyLever products. (Northcutt Decl. ¶ 18; Brenner Decl. Exs. 16 (Innes Dep. Tr. at 17:15–22); 21 (Poole 8/5/03 Dep. Tr. at 239:8–11).)

Under DiverseyLever's ownership, dealers paid different prices for chemical concentrates than the branches paid. (Cosgrove Decl. Ex. 50) (Chapman Dep. Tr. at 37:1–6); 70 (Tucker Dep. Tr. at 98:23–99:6).) Additionally, to generate more revenue for ACS, ACS chemists increased the prices of reformulated concentrates by a factor of six over cost. (*Id.* Ex. 50 (Chapman Dep. Tr. at 38, 41–45, 47–48).) Furthermore, branches were charged the "total cost on our cost records," which included the materials plus a flat labor charge. (*Id.* Ex. 70 (Tucker Dep. Tr. at 30, 98–103).) For the dealers, however, ACS would double the labor rate (*id.* Ex. 70) (Tucker Dep. Tr. at 104–105), and then "use[ ] a factor anywhere from two to three times to come up with a final cost," (*id.* Ex. 70) (Tucker Dep. Tr. at 106). For dishwashing machines, branches paid "thirteen hundred ... whatever [ACS's] cost was," but the dealers paid "in the seventeen, eighteen hundred dollar range." (*Id.* Ex. 70 (Tucker Dep. Tr. at 118–19).) This information was not shared with the dealers. (*Id.* Ex. 70) (Tucker Dep. Tr. at 99:7–14.)

## VII. S.C. Johnson Acquires DiverseyLever

In early 2002, Unilever was prepared to sell DiverseyLever to S.C. Johnson Commercial Markets, Inc. ("S.C.Johnson"). On March 8, 2002, Plaintiffs filed their first Complaint against Unilever and DiverseyLever. On April 19, 2002, S.C. Johnson

formed Auto–C, LLC, a wholly-owned subsidiary. (Cosgrove Decl. Ex. 67 (Quast Dep. Tr. at 28).) On May 3, 2002, S.C. Johnson, doing business as Johnson Wax Professional, acquired DiverseyLever and changed its name to JohnsonDiversey, Inc. (Northcutt Decl. ¶ 17.) In this transaction, DiverseyLever transferred ACS to Auto–C. (*Id.* ¶¶ 5, 6; RFAC ¶ 72.) Diversey-Lever then became known as DLever.

Dealers again expressed concerns over how this acquisition would impact them. In September 2002, JohnsonDiversey addressed these concerns and proposed a "culture of cooperation":

> JohnsonDiversey has asked its sales force not to knowingly solicit business being served by an Auto–Chlor dealer. If a JohnsonDiversey sales representative learns that an Auto–Chlor dealer's customer is dissatisfied with the servicing dealer, the sales representative will give the affected Auto–Chlor dealer a chance to satisfy the customer and keep the business. Only if those efforts fail will the JohnsonDiversey sales representative pursue the customer. Auto–Chlor asks that its independent dealers extend the same courtesies to JohnsonDiversey and focus their sales efforts on customers being served by unaffiliated companies like Ecolab.

(Cosgrove Decl. Ex. 29.) Again, some dealers followed this plan, and some did not. (Brenner Supp. Decl. ¶ 18, Ex. 3 (Poole 8/4/03 Dep. Tr. at 180–81); id. ¶ 18, Ex. 5 (R. Durham 8/1/03 Dep. Tr. at 199:12–19); *id.* ¶ 18, Ex. 8 (McPhail 8/3/03 Dep. Tr. at 309:6–310:3); Cosgrove Decl. Ex. 72 (White/Stewart 8/27/03 Dep. Tr. at 272:17–20, 277:12–16).)

Under Auto–C, new products continued to be introduced. For example, in 2003 it introduced a highly concentrated low temperature warewashing line of products called "Mach 1 DryMate," and "Mach 2 WashMate." (Innes Decl. in Opp'n to Pl.'s Mot. for Sum. J. ¶ 4.) Auto–C permitted the dealers to mix and package "Mach 1 DryMate" themselves, but they were required to purchase "Mach 2 WashMate" as a finished product. (*Id.*)

## VIII. Plaintiffs' Claims

In their Revised Fourth Amended Complaint ("RFAC"), Plaintiffs allege thirteen claims: breach of contract (Claim I); breach of the implied covenant of good faith and fair dealing (Claim II); tortious interference with prospective business relations (Claim III); tortious interference with contractual relations (Claim IV); violation of the Minnesota Franchise Act, Minn.Stat. § 80C.01 *et seq.* (Claim V); violation of the Colorado Consumer Protection Act (Claim VI); violation of the New Mexico Unfair Practices Act (Claim VII); statutory inducement of breach of contract in violation of Tenn. Stat. § 47–50–109 (Claim VIII); promissory estoppel (Claim IX); common law unfair competition (Claim X); false designation of origin, false description and palming off in violation of the Lanham Act, 15 U.S.C. § 1125 (Claim XI); declaratory relief (Claim XII); and injunctive relief (Claim XIII). Before the Court is Defendants' summary judgment motion with respect to each of the claims.

### Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. *See Celotex,* 477

U.S. at 322, 106 S.Ct. 2548; *Mems v. City of St. Paul, Dep't of Fire & Safety Servs.*, 224 F.3d 735, 738 (8th Cir.2000). The court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *See Graves v. Arkansas Dep't of Fin. & Admin.*, 229 F.3d 721, 723 (8th Cir.2000); *Calvit v. Minneapolis Pub. Schs.*, 122 F.3d 1112, 1116 (8th Cir.1997). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995).

## Analysis

Before the Court are four motions. In two Motions, Defendants have moved for summary judgment on all of Plaintiffs' claims. (*See* Doc. Nos. 279, 324 and accompanying memoranda.) In the third Motion, Defendant DLever seeks "partial summary judgment on those portions of Plaintiffs' breach of contract claim and any other claim that allege either that the Contracts gave Plaintiffs exclusive rights to DiverseyLever trademarks, trade names or products ('Trademarks') in their territories, or somehow gave the Plaintiffs negative control over DiverseyLever or JohnsonDiversey Trademarks." (*See* Doc. No. 240 and accompanying memoranda.) In the fourth Motion, plaintiffs have moved for partial summary judgment seeking declarations that "a franchise relationship has existed between Plaintiffs and Defendants at all relevant times;" and that "Plaintiffs were and are entitled by their contracts to receive the formulas and specifications for Defendants' chemical prod-

ucts that Plaintiffs sell, and to purchase or prepare those products themselves so long as they conform to Defendants' formulas and specifications." (*See* Doc. No. 237 and accompanying memoranda.)

The Court will begin with Plaintiffs' contract claims.

## I. Breach of Contract and Implied Covenant of Good Faith and Fair Dealing

Plaintiffs allege several breach of contract claims against Auto–C and DLever.[4] Tennessee law governs the Dealer Contracts. (Cosgrove Decl. Exs. 1–7 (Dealer Contracts ¶ 13).) The Tennessee Supreme Court has expressed the law concerning contract interpretation:

> In resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.... This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the effect of the words, there is no genuine issue left for the jury to decide....
>
> A court's initial task in constructing a contract is to determine whether the language of the contract is ambiguous. Once found to be ambiguous, a court applies established rules of construction to determine the parties' intent. Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a question of fact appropriate for a jury....

4. JohnsonDiversey is not a party to the Dealer Contracts, *Auto–Chlor System of Minnesota, et al. v. DiverseyLever, et al,* Civ. No. 02–535, Report and Recommendation at 16, 20

(D.Minn. Aug. 18, 2003), *adopted* (D.Minn. Sept. 29, 2003) (Kyle, J.), and Plaintiffs Revised Fourth Amended Complaint does not allege breach of contract claims against it.

The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern.... The intent of the parties is presumed to be that specifically expressed in the body of the contract.... If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes.

A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.... Where the terms of the contract are ambiguous, the intention of the parties cannot be determined by a literal interpretation of the language, and the courts must resort to other rules of construction.

*Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.,* 78 S.W.3d 885, 889–90 (Tenn.2002) (citations and internal quotations omitted).

■■■ The Uniform Commercial Code ("UCC"), adopted in Tennessee, codifies the law of contracts applicable to "transactions in goods." Tennessee applies the "predominant factor test" to determine whether the UCC applies to a given contract or transaction: was the essence of or dominant factor in the formation of the contract the provision of goods or services? *See Hudson v. Town & Country True Value Hardware, Inc.,* 666 S.W.2d 51, 53 (Tenn.1984) (citing with approval *DeFilippo v. Ford Motor Co.,* 516 F.2d 1313 (3d Cir.1975)). No Tennessee case addresses whether a distribution agreement is a contract for the sale of goods, "but the rule in the majority of jurisdictions is that distributorships (both exclusive and non-exclusive) are to be treated as sale of goods contracts under the UCC." *Sally Beauty Co., Inc. v. Nexxus Prods. Co., Inc.,* 801 F.2d 1001, 1005 (7th Cir.1986) (citing cases).

■■■ There are several contract claims before the Court, but before delving into them one recurring issue that must be addressed is whether the Dealer Contracts may be orally modified notwithstanding the following language:

It is mutually agreed by the parties that no addition, change or erasure of any printed portion of this Contract, except the filling in of specified blank spaces and lines, shall be valid or binding upon either party hereto and that no verbal agreements of any nature, relating to the subject matter of this Contract or to any relationship between the parties, will be considered valid or enforceable.

(*See* Cosgrove Decl. Exs. 1–7 (Dealer Contracts ¶ 9).) Plaintiffs contend that they can be orally modified, and cite *Shah v. Racetrac Petroleum Co.,* 338 F.3d 557, 573 (6th Cir.2003) in support. (Pls.' Resp. to Defs.' Mot. for Summ. J at 26.) In *Shah,* the Sixth Circuit analyzed the oral modification of a lease agreement and determined that, "In Tennessee, '[a]fter a written contract is made, it may be modified by the express words of the parties in writing, as well as by parol.'" *Shah,* 338 F.3d at 573 (citations omitted). In a footnote the court added, "This is true even if the contract expressly specifies that the parties may only modify the agreement in writing." *Id.* at 573 n. 10 (citation omitted). Defendants respond that the rule is different for contracts governed by the UCC. (Defs.' Reply Br. in Supp. of Defs.' Mot. for Summ. J. at 13.) Citing Tenn. Stat. § 47–2–209(2) and *Knoxville Rod and Bearing, Inc. v. Bettis Corp.,* 672 S.W.2d 203 (Tenn.Ct.App.1983), Defendants contend that so-called "no oral modification" clauses are enforced in UCC contracts. (*Id.*) Defendants are correct.

*Shah* involved a lease agreement and the court never addressed the propriety of oral modifications under the UCC. 338

F.3d at 572–73. Under the UCC, "[a] signed agreement which excludes modification ... except by a signed writing cannot be otherwise modified ... but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." Tenn. Stat. § 47–2–209(2). The Tennessee Court of Appeals in *Knoxville Rod* dealt with the relationship of this UCC provision and the general rule of oral modifications under the common law:

> We are not unmindful of the general rule established in this state by court decision that allows contracts to be orally modified even if the contracts specifically state that the contract can only be modified in writing.... However, the cases establishing this rule are not in the face of an express statutory prohibition as we have in ... § 47–2–209(2).... This is clearly recognized by the legal writers as an exception to the general rule for the oral modification of a written contract which specifically provides that oral modification cannot be made....

> The contract involved herein is a transaction in goods between merchants and is controlled by the provisions [of] § 47–2–209(2) ... prohibiting oral modification. Accordingly, the contract cannot be and was not modified as suggested by plaintiff.

672 S.W.2d at 208 (citations omitted). Thus, under § 47–2–209(2) and *Knoxville Rod*, the Dealer Contracts cannot be orally modified.

### A. Product Development

■ Plaintiffs' first claim is that Defendants have failed their obligation to develop new products. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 47–48.) They cite the following contract provision for support:

> The Company will, at its own expense, continue its research for the purpose of advancing the art and improving the commercial dishwashing industry, but the company shall be under no obligation to manufacture or distribute any article or product discovered, improved, or made, whether patented or not, or to sell such product to Dealer except that if the Company does discover, improve, or make an article or product not now in use in the field of commercial dishwashing as covered by this Contract, and desires to commercially market said article or product, Dealer shall have the right to represent the Company in Dealer's Territory upon such terms as Company offers to others.

(Cosgrove Decl. Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 11).) A nearly identical provision exists in the 1971 Dealer Contract. (*Id.* Exs. 2, 4, 5) (1971 Dealer Contract ¶ 11.)

Relying upon the plain language of the Dealer Contracts, Defendants contend that they are under no obligation to develop new products. (Defs.' Br. in Supp. of Mot. for Summ. J. at 21.) Plaintiffs respond that Defendants "represented to [them] over time that [Defendants were] working diligently toward that goal of developing new and improved products and equipment" (Pls.' Resp. to Defs.' Mot. for Summ. J. at 48 (citing Cosgrove Decl. Exs. 13, 14, 21)), but they "have since entirely abandoned the effort to develop new concentrates or new products for the Auto–Chlor brand," (*id.*). They insist that instead of developing new products, Defendants only reformulated existing ACS or JohnsonDiversey products. (*Id.* (citing Cosgrove Decl. Ex. 50) (Chapman Dep. Tr. at 30:1–34:6, 101:24–104:4, 108:19–109:19).)

Under the agreements, ACS is obligated to "continue its research" but "shall be under no obligation to manufacture or distribute any ... product discovered, improved, or made." (Cosgrove Decl. Exs. 1,

3, 6, 7 (1981, 1984 Dealer Contract ¶ 11); *see id.* Exs. 2, 4, 5 (1971 Dealer Contract ¶ 11).) This provision is unambiguous. Based upon its usual, natural, and ordinary meaning, Defendants have no obligation to create or develop any new products. To succeed on its claim, Plaintiffs must offer evidence that Defendants have failed to continue their *research.* They have not done so. Accordingly, the Court will grant Defendants summary judgment on this claim.[5]

### B. Promotions

■ Plaintiffs next allege that Defendants have failed to meet their obligation to promote Plaintiffs' businesses. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 48–49.) Plaintiffs cite no contractual provision in support of such an obligation, but rely upon the "clear course of conduct over a period of many years" where Defendants "assist[ed] with marketing by providing promotional literature and materials." (*Id.* at 48.) Citing an October 6, 2000 letter from Kirk Northcutt, then Vice President of Dealer Development for DiverseyLever (Northcutt Decl. ¶ 2), Plaintiffs assert that "DiverseyLever committed to providing enhanced marketing and improved promotional literature," (Pls.' Resp. to Defs.' Mot. for Summ. J. at 49 (citing Cosgrove Decl. Ex. 45)). This letter states that DiverseyLever "will support the Auto–Chlor marketing, product and branding requirements" and will "continue to provide … marketing … support for Auto–Chlor." (Cosgrove Decl. Ex. 45.)

Plaintiffs' claim fails because the Dealer Contracts do not obligate Defendants to promote ACS products on Plaintiffs' behalf. On the contrary, to the extent that any promotional activity is required, the contracts obligate Plaintiffs "[t]o list in Dealer's local Telephone Directory, and at Dealer's expense, the name 'AUTO–CHLOR SYSTEM.'" (*Id.* Exs. 2, 4, 5 (1971 Dealer Contract ¶ 2(e)); *see id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 2(f)).) Thus, it is clear that at the time the contracts were entered into, the parties intended *Plaintiffs* to carry out any promotions.

Although Plaintiffs point to Northcutt's letter, it does not—and cannot—alter the Dealer Contracts to obligate Defendants to promote Auto–Chlor. Each Dealer Contract specifically provides that "no addition, change or erasure of any printed portion of this Contract, except the filling in of specified blank spaces and lines, shall be valid or binding." (Cosgrove Decl. Exs. 1–7 (Dealer Contracts ¶ 9).) In addition, the 1981 and 1984 Dealer Contracts provide that "[t]he terms of this Contract may not be altered or modified except upon the prior written consent of the parties hereto." (*Id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 17).)

■ Even if the Dealer Contracts obligated Defendants to promote Auto–Chlor, either as originally written or as modified, the evidence upon which Plaintiffs rely does not support their allegations of a breach. For example, Plaintiffs allege that after Defendants took over ACS there "has since been a dramatic drop-off in new literature and materials" promoting Auto–Chlor. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 49.) For this point, Plaintiffs cite the testimony of Jerry Ivy, a non-party who owns several ACS dealerships. (*See id.)* (citing cosgrove Decl. Ex. 60 (Ivy Dep. Tr. at 49:18–51:1).) But Ivy does not

---

5. Even if Defendants were contractually obligated, the record shows that new products were developed under both DiverseyLever and Auto–C. (Innes Decl. in Opp'n to Pls.' Mot. for Summ. J. ¶¶ 3, 4; Brenner Decl. Exs. 16 (Innes Dep. Tr. at 31–35); Northcutt Decl. ¶¶ 8–10.) Plaintiffs admit as much. (Brenner Decl. Exs. 18 (Merrifield Dep. Tr. 234:6–24); 21 (Poole Dep. Tr. at 119:9–120:21).)

mention any "dramatic drop-off" in new promotions:

> Q. [W]hat do you get out of the royalty you pay?
>
> A. What do I get out of the royalty? I get a, probably the—we get the exclusive use of the Auto–Chlor machine, we get supply, they stock supplies, parts, so when we order them we can, you know, we can get them. . . . [T]hey do a lot of regulatory work. . . . They do, well, they do, when we're talking about marketing, they furnish the literature, which they've done an excellent job on, at least Unilever did, DiverseyLever, I mean that type of thing.
>
> Q. Okay. So their course of conduct has been to assist you with giving you promotional pieces; is that correct?
>
> A. Oh, yes.

(Cosgrove Decl. Ex. 60) (Ivy Dep. Tr. 48:19–49:13.) Rather than a drop-off, Ivy testified that DiverseyLever provided "first class" promotional literature that "put us on a par with our competition." (*Id.* Ex. 60 (Ivy Dep. Tr. at 49:24, 50:7–8).) When asked if there were any changes in the quantity or quality of promotional literature put out since the JohnsonDiversey acquisition, Ivy responded, "I don't know whether there has been literature come out." (*Id.* Ex. 60 (Ivy Dep. Tr. at 50:17–18).)

Plaintiffs also allege that Defendants' "trade shows and similar promotions have focused exclusively on DiverseyLever (and later JohnsonDiversey), to the exclusion of Auto–Chlor." (Pls.' Resp. to Defs.' Mot. for Summ. J. at 49.) For this point, Plaintiffs rely on the testimony of Michael Marchino, an ACS–Minnesota employee, and on an October 1, 2003 complaint letter written by Kenneth Poole, former President of ACS–Kansas and Golden Light. (*Id.*) (citing Cosgrove Decl. Exs. 63 (Mar-

chino Dep. Tr. 142:15–143:7), 46 (Letter dated 10/1/03 from Poole to Northcutt).) But again, this evidence does not support Plaintiffs' position. Marchino does not state that Auto–Chlor products were excluded from trade shows:

> Q. . . . In all the restaurant shows that you went to did Auto–Chlor have its own booth? In other words, it was just Auto–Chlor?
>
> A. The first year or two—I'm not sure. The first year or two, yes. Then I guess maybe in '99 it was maybe all the businesses were represented in the booth.
>
> Q. By "all the businesses" who do you mean?
>
> A. You know, there was Unilever products there. There were Diversey products *and Auto–Chlor products.*

(Cosgrove Decl. Ex. 63 (Marchino Dep. Tr. 142:22–143:7) (emphasis added).) Similarly, Poole's letter says nothing about the exclusion of Auto–Chlor products. Poole simply objects to paying a bill for a particular trade show booth:

> We are in receipt of invoice 823299 in the amount $158.47, invoicing us for a portion of the TRA [Texas Restaurant Association] booth for Johnson/Diversey. No communication was made with us asking if we wished to participate in advertising and solicitation of business for Johnson/Diversey. Had there been any communication with this firm, we would have declined to participate in promoting Johnson/Diversey. We have not, for several years, received any leads from trade shows promoted and held by Johnson/Diversey.
>
> We are returning invoice 823299 as unpaid. Please issue credit to this firm for the unauthorized charge.

(*Id.* Ex. 46.) [6]

Because the Dealer Contracts do not obligate Defendants to promote Plaintiffs'

---

**6.** Plaintiffs also rely on the testimony of An- thony Vertin, the owner of ACS–Minnesota.

businesses, and because Plaintiffs have not generated a genuine issue of material fact of a breach even if Defendants were so obligated, the Court will grant Defendants summary judgment on this claim.

### C. National and Chain Accounts

■ Plaintiffs next allege that Defendants have not carried out their obligation to develop national and chain accounts. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 49–50.) Again, Plaintiffs cite no contractual provisions in support of their claim, but rather contend that "Defendants promised efforts to promote national and chain accounts." (*Id.* at 50.) Plaintiffs point to two documents in support. (*Id.* (citing Cosgrove Decl. Exs. 14, 21).) The first is the "Merger Information Packet" ACS provided to the dealers during the initial Unilever acquisition. It states that as a result of the acquisition "[s]upport will improve significantly in several key areas," including "national accounts." (Cosgrove Decl. Ex. 14 at 2). The second is the December 1998 letter from Griesbeck that states, among other things, that "[w]e believe the acquisition of further selected major chain accounts will be of benefit to all divisions of [DiverseyLever]." (*Id.* Ex. 21 at ¶ 5). Plaintiffs also point to various statements Defendants made concerning national and chain accounts. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 50) (citing Cosgrove Decl. Exs. 52) (M. Durham Dep. Tr. at 125:5–130:19, 199:21–204:7); 66 (Poole Dep. Tr. at 265:15–267:24); 72 (White/Stewart Dep. Tr. at 76:19–77:9).

The Dealer Contracts say nothing about national or chain accounts. Rather, to the extent business development is contemplated, the contracts require Plaintiffs to develop business in their territories. The 1971 Dealer Contracts obligate Plaintiffs to "work and develop . . . the . . . specified territory" and "faithfully and diligently serve the territory so granted and to put forth the necessary effort to secure contracts for the use and distribution of the Company's products." (Cosgrove Decl. Exs. 2, 4, 5 (1971 Dealer Contract ¶ 2); *see id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 2).) Defendants' alleged statements concerning national and chain accounts do not alter or modify their contractual obligations. (*Id.* Exs. 2, 4, 5 (1971 Dealer Contract ¶ 9); *id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶¶ 9, 17)); *see* Tenn. Stat. § 47–2–209(1); *Knoxville Rod,* 672 S.W.2d at 207–08. Accordingly, because the Dealer Contracts did not obligate Defendants to develop national or chain accounts, the Court will grant Defendants summary judgment on this claim.[7]

### D. Exclusive Territory

■ Plaintiffs next allege that Defendants have violated the exclusive territory provision of the Dealer Contracts. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 30–38.) The Dealer Contracts provide Plaintiffs with "the exclusive right to use the Registered Trademarks and Trade Names and the Company's products" within a specified territory. (Cosgrove Decl. Exs. 1–7 (Dealer Contracts ¶ 1).) With one exception,[8] Plaintiffs do not claim that Defendants sell Auto–Chlor branded products in their exclusive territories. (*See* Bren-

---

(Pls.' Resp. to Defs.' Mot. for Summ. J. at 49) (citing Cosgrove Decl. Ex. 71 (Vertin Dep. Tr. at 288:5–23).) But Vertin's testimony is wholly conclusory, internally inconsistent, and is based on hearsay.

**7.** Plaintiffs' claims of "promises" are more appropriately analyzed as promissory estop-

pel claims and not breach of contract claims. The Court will consider Plaintiffs' promissory estoppel claims with respect to national or chain accounts below. (*See infra* Analysis Part IV.)

**8.** ACS–Jacksonville's allegations are addressed below.

ner Decl. Exs. 19 (McPhail 8/7/03 Dep. Tr. at 120:12–121:6); 21 (Poole 8/4/03 Dep. Tr. at 159:2–160:3); 23 (White/Stewart 8/27/03 Dep. Tr. at 68:6–71:10).) Rather, Plaintiffs contend that DiverseyLever and Johnson-Diversey have breached the exclusive territory provision by the acquisition of Plaintiffs' competitor, Americlean. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 31–32.) Americlean, according to Plaintiffs, sells "essentially identical products" as Plaintiffs in Plaintiffs' territories. (*Id.* at 36.)

Defendants contend that Plaintiffs have no contractual right to control the sale of non-Auto-Chlor products in their territory and cannot seek to imply a non-compete provision when none exists. (Defs.' Brief in Supp. of Mot. for Summ. J. at 22–28; Defs.' Reply Brief in Supp. of Defs.' Mot. for Summ. J. at 7). Defendants are correct.

Americlean's competition does not breach the Dealer Contracts. In the Dealer Contracts, ACS promised Plaintiffs that they would have an exclusive territory to use ACS's trademarks and products. (Cosgrove Decl. Exs. 1–7 (Dealer Contracts ¶ 1).) ACS did not promise that no affiliate or parent would compete with Plaintiffs in the sense of using non-Auto-Chlor trademarks and products in Plaintiffs' territory. There is a difference between a non-compete provision, which Plaintiffs' contracts do not contain, and a product specific exclusive territory provision, which the contracts do contain.

Plaintiffs recognized this difference when they negotiated their Dealer Contracts. Paragraph 1 provides Plaintiffs with an exclusive territory, while paragraph 5(d) of the 1971 Dealer Contract and paragraph 5(f) of the 1981 and 1984 Dealer Contracts prohibit Plaintiffs from engaging "directly or indirectly . . . in the business of sanitizing or cleansing eating utensils by use of an automatic dispenser or equipment similar to the Auto-Chlor System, or by use of automatic dishwashing machines, or selling, installing or servicing such equipment or materials therefor, or to engage in a similar or competitive line of business" in the specified territory for one year after termination. (*Id.* Exs. 2, 4, 5 (1971 Dealer Contract ¶ 5(d)); *see id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contacts ¶ 5(f)).) Because the parties clearly recognized the difference, the Court will not find an implied covenant not to compete. *See So Good Potato Chip Co. v. Frito–Lay, Inc.,* 462 F.2d 239, 240–41 (8th Cir.1972) ("A [negative] covenant cannot be implied if the parties have either expressly dealt with the matter in the contract or have left the agreement intentionally silent on the point." (citations omitted)). Furthermore, the Dealer Contracts provide that "[t]his Contract is not transferrable or assignable by Dealer, except upon agreement of both parties hereto," (Cosgrove Decl. Exs. 1–7) (Dealer Contracts ¶ 4), but does not similarly restrict the transfer or assignment by ACS. Had the parties intended to restrict the ACS from assigning the Dealer Contracts, they could have done so.[9]

---

9. Plaintiffs also argue that "even if the Court finds that competition with the ACS [dealers] within their territories is not a direct violation of the express terms of their [Dealer Contracts], a jury is entitled to consider whether it violates the implied covenant of good faith and fair dealing." (Pls.' Resp. to Defs.' Mot. for Summ. J. at 38.) They are incorrect. The duty of good faith and fair dealing is not actionable where the alleged "bad faith" actions involve the performance of terms that are not part of the contract. *See Lawhorn & Associates, Inc. v. Patriot Gen. Ins. Co.,* 917 F.Supp. 538, 543 (E.D.Tenn.1996) ("For there to be a breach of such a duty [of good faith and fair dealing], [plaintiffs] would have to point to specific contractual provisions violated by [d]efendants."); *Beer Wholesalers, Inc. v. Miller Brewing Co.,* 426 N.W.2d 438, 441–42 (Minn.Ct.App.1988) ("[The] implied covenant [of good faith and fair dealing] did not extend to the performance of actions outside the scope of the written agreement." (citation omitted)); *see also Wallace v. National Bank of Commerce,* 938 S.W.2d 684, 687 (Tenn.

■ Likewise, Americlean's sale of similar products does not breach the contracts. Plaintiffs only have an "exclusive right to use the registered trademarks, and trade names and the Company's basic equipment and Company's products" within their territory. Plaintiffs do not accuse any Defendant of selling anything with an Auto–Chlor trademark on it, nor do they accuse anyone of selling Auto–Chlor products or equipment. Rather, Plaintiffs accuse DiverseyLever and, later, JohnsonDiversey representatives of selling non-Auto-Chlor products in Plaintiffs' territory. But despite the mergers and acquisitions, Plaintiffs have no rights to those products. As the Tennessee Court of Appeals has observed,

> [o]ne of the general principles of the law of assignments is that the assignee 'steps into the shoes of the assignor' with regard to the matters covered by the assignment.... Thus, an assignment does not extinguish the underlying contract, but rather it transfers the assignor's contract rights against the other contracting party to the assignee who succeeds to the assignor's rights under the underlying contract.

*SunTrust Bank v. Johnson*, 46 S.W.3d 216, 226 (Tenn.Ct.App.2000) (citations omitted). In other words, "assignment of a contract will result in the assignee stepping into the shoes of the assignor with regard to the

rights that the assignor held and not in an expansion of those rights to include those held by the assignee." *Medtronic Ave, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 60 (3d Cir.2001); *see Citibank, N.A. v. Tele/Resources, Inc.*, 724 F.2d 266, 269 (2d Cir.1983) ("An assignment does not modify the terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party charged.... Insofar as an assignment touches on the obligations of the other party to the underlying contract, the assignee simply moves into the shoes of the assignor."). If DiverseyLever and Auto–C stand in the shoes of ACS, and their rights are neither enlarged nor diminished as to the Plaintiffs, then the reverse must also be true: Plaintiffs' rights are neither enlarged nor diminished as to DiverseyLever and Auto–C. *See, e.g., Capitan Enters., Inc. v. Jackson*, 903 S.W.2d 772, 776 (Tex. App.1994). Said another way, if DiverseyLever and Auto–C stand in the shoes of ACS, Plaintiffs must remain in their own shoes. Plaintiffs have cited no authority to the contrary. Thus, Plaintiffs cannot claim an exclusive right to Americlean products—or DiverseyLever or JohnsonDiversey products for that matter—because when Plaintiffs entered the Dealer Contracts, those products were not ACS products.[10]

---

1996) ("Performance of a contract according to its terms cannot be characterized as bad faith."). In other words, "[t]he implied duty of good faith and fair dealing ... cannot supply essential terms of a contract on which the minds of the parties have not met." *Lawhorn*, 917 F.Supp. at 543 (citation and internal quotations omitted); *see Massey v. Tandy Corp.*, 987 F.2d 1307, 1309–10 (8th Cir.1993) ("By relying on the covenant of good faith, [plaintiff] seeks to implicitly inject additional terms governing this issue. Such additional terms cannot be added by relying on the covenant of good faith." (citations omitted)).

10. Defendant DLever has filed a Motion (Doc. No. 240) seeking "partial summary judgment on those portions of Plaintiffs' breach of contract claim and any other claim that allege either that the Contracts gave Plaintiffs exclusive rights to DiverseyLever trademarks, trade names or products ('Trademarks') in their territories, or somehow gave Plaintiffs negative control over DiverseyLever or JohnsonDiversey Trademarks." (Defendant DLever, Inc.'s Mem. in Supp. of Mot. for Partial Summ. J. at 2.) For the reasons expressed above, the Court will grant DLever's Motion. Plaintiffs do not have exclusive rights to, or negative

■ The Court now turns to ACS–Jacksonville's arguments. ACS–Jacksonville alleges that Defendants are in breach by selling Auto–Chlor products to an entity outside its territory who potentially resells those products in its territory. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 33.) ACS–Jacksonville's President, Robert Durham, explains:

Q. What is it that you claim that the parent company did wrong?

A. They're distributing Auto–Chlor products to these customers in my protected territory.

Q. Describe how you believe they're distributing Auto–Chlor products in your territory.

A. They told me they were.

Q. What did they tell you?

A. That they were selling products to [Shoneys'] commissary that would end up eventually—had potential to end up in our territory. . . .

Q. . . . What's a commissary?

A. A commissary is a big building where they ship in bulk products that can be distributed on a smaller scale. . . . The store managers, when they're ordering their meats and their fruits and vegetables from their commissary, they also can order Auto–Chlor branded products, and they do. . . .

(Brenner Decl. Ex. 11 (R. Durham 8/1/03 Dep. Tr. 126–28).) The commissary, Commissary Operations Inc., is located in Atlanta and Tifton, Georgia. (*Id.* Ex. 11 (R. Durham 8/1/03 Dep. Tr. at 130, 134–35).) By virtue of the commissary, Shoneys restaurants in ACS–Jacksonville's territory "can go through their computer system and order these products, Auto–Chlor

products, cheaper than they can buy them from us from this company in Tifton, Georgia, and that they do." (*Id.* Ex. 11 (R. Durham 8/1/03 Dep. Tr. at 135).)

While ACS may be selling Auto–Chlor products to the commissary located in Atlanta and Tifton, Georgia, the commissary is not within ACS–Jacksonville's exclusive territory. Atlanta is in Fulton County and Tifton is in Tift County. ACS–Jacksonville's exclusive territory, however, extends only to the Georgia Counties of Brantley, Glynn, Charlton, and Camden. (Cosgrove Decl. Ex. 5 (ACS–Jacksonville Dealer Contract ¶ 1).) Therefore, ACS's sales to the commissary do not breach the Dealer Contract.

**E. Providing Chemical Formulas and Specifications**

■ Plaintiffs assert that they "were and are entitled by their contracts to receive the formulas and specifications for Defendants' chemical products that Plaintiffs sell, and to purchase or prepare those products themselves so long as they conform to Defendants' formulas and specifications." (Pls.' Mem. of Law in Supp. of Mot. for Partial Summ. J. at 1–2.) It is clear from their arguments, and from the questions their attorneys asked in depositions,[11] that when Plaintiffs say "chemical products" what they want are the formulas for Defendants' secret chemical concentrates.

Each of the Dealer Contracts provide ·that "[t]he Company agrees to furnish to Dealer its confidential formulas and specifications for mixing chemical products to be offered for sale." (Cosgrove Decl. Exs.

---

control over, DiverseyLever or JohnsonDiversey trademarks, trade names or products.

11. For example, in the deposition of Jerry Ivy, Plaintiffs' counsel asked the following question: "Q: My understanding is the franchise

agreements state that Auto–Chlor Memphis will give you the formulas for the concentrates, is that your understanding?" (Gierke Decl. in Opp'n to Pls.' Mot. for Summ. J. ¶ 2, Ex. 9 (Ivy 10/23/03 Dep. Tr. at 124:16:19).)

1–7 (Dealer Contracts 3(b)(2)).) In addition, Plaintiffs "may prepare from material purchased from any source it may select, chemical products, provided they comply with the Company's specifications; or the Dealer may purchase such chemical products from any source it may select, provided such products comply with the Company's specifications." (*Id.* Exs. 2, 4, 5 (1971 Dealer Contract ¶ 3(c)).) The 1981 and 1984 Dealer Contracts provide similar language. (*Id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 3(c)).)

The Dealer Contracts do not entitle Plaintiffs to the formulas of Defendants' chemical concentrates. Plaintiffs overlook two key words of the Dealer Contract which obligate ACS to "furnish to Dealer its confidential formulas and specifications *for mixing* chemical products." [12] (*Id.* Exs. 1–7 (Dealer Contracts 3(b)(2)).) Had the parties intended that Plaintiffs would receive the confidential formulas and specifications for the chemical concentrates themselves, they could have easily omitted the word "mixing." But they did not. Moreover, the "chemical products" at issue are those "to be offered for sale." It is undisputed, however, that chemical concentrates are not offered for sale; rather, only the end product is sold. Therefore, even if the words "for mixing" were omitted, Plaintiffs still would not be entitled to the concentrate formulas. Under the usual, natural, and ordinary meaning of the contractual language, *Planters Gin*, 78 S.W.3d at 889–90, Plaintiffs are not entitled to the concentrate formulas.

The parties' course of performance since the inception of the Auto–Chlor System confirms this reading of the contract. A course of performance can explain what the parties meant by this provision. *See* Tenn. Stat. § 47–2–202.

Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

*Id.* § 47–2–208(1). As the comments to § 47–2–202 observe, "the course of actual performance by the parties is considered the best indication of what they intended the writing to mean." *Id.* § 47–2–202, official comment 2. Over the last sixty years, no dealer ever received the formula for the chemical concentrate. Rather, the dealers received a confidential mixture formula necessary to make Auto–Chlor products. One of the ingredients in the mixture formula was an ACS chemical concentrate. (Brenner Decl. in Opp'n to Pls.' Mot. for Summ. J. ¶ 2, Ex. 8 (Harding 11/20/03 Dep. Tr. at 145:24–146:13).) But the dealers—both litigating dealers and non-litigating dealers—admit that they were never given the formula for the concentrate itself. (*Id.* Exs. 1 (Alsup 10/29/03 Dep. Tr. at 14:23–15:25); 4 (M. Durham 7/31/03 Dep. Tr. at 33:6–36:25); 5 (Eastman 10/17/03 Dep. Tr. at 89:1–91:8); 9 (Ivy 10/23/03 Dep. Tr. 123:5–124:23); 12 (McPhail 8/8/03 Dep. Tr. at 418:12–419:3); 13 (Merrifield 7/28/03 Dep. Tr. at 145:19–146:6); 14 (Poole 8/4/03 Dep. Tr. at 65:10–23); 15 (White/Stewart 8/28/03 Dep. Tr. at 391:13–392:3); 16 (Vertin 7/23/03 Dep. Tr. at 24:5–25:9).) Defendants agree. (*Id.* Exs. 6 (Fakes 8/14/03 Dep. Tr. at 42:1–4, 82:11–83:14, 83:20–84:6); 8 (Harding 11/20/03 Dep. Tr. at 145:24–146:13).)

Plaintiffs stress that they must be entitled to the concentrate formulas because

---

**12.** To be clear, just as Plaintiffs are not entitled to an exclusive right to use JohnsonDiversey or DLever trademarks or products, they have no right to formulas or specifications for mixing JohnsonDiversey or DLever products. *See supra* Analysis Part I.D.

under paragraph 3(c) they are allowed to purchase materials for the chemical products or the chemical products themselves from other sources. Without the concentrate formulas, they assert, "[t]his becomes quite literally impossible" and would render paragraph 3(c) meaningless. (Pls.' Reply in Supp. of Mot. for Summ. J. at 12.) The Court disagrees.

First, Plaintiffs may prepare chemical products from "materials purchased from any source." Construing paragraphs 3(b)(2) and 3(c) together, Defendants must provide the mixing formula and Plaintiffs can buy "materials"—other than the concentrate—from another source to make the chemical product. The concentrate is only an ingredient of the formula. Second, Plaintiffs may "purchase chemical products from any source." "Chemical products" in paragraph 3(c) is not defined, but it should mean the same as in paragraph 3(b)(2), the immediately preceding paragraph, where "chemical products" are those "offered for sale." Construing paragraphs 3(b)(2) and 3(c) together, Defendants must provide the mixing formula and Plaintiffs may purchase chemical products which do not contain an Auto–Chlor concentrate from other sources, as long as the product otherwise complies with the mixture formula. Whether there has ever been such a situation, the Court cannot determine. Suffice it to say that the parties contemplated such a possibility when they drafted the contracts. In any event, Plaintiffs agreed to the contract as written and have performed it consistently over the entire history of Auto–Chlor without ever receiving the formulas for the concentrates.

▇▇▇ The final matter raised on this issue is whether Plaintiffs are entitled to mixing formulas for the new prepackaged products that Defendants offer. (*See* Defs.' Br. in Opp'n to Pls.' Mot. for Partial Summ. J. at 23–34; Pls.' Reply in Supp. of Mot. for Partial Summ. J. at 14.) Since the time the Dealer Contracts were entered into, ACS, and its subsequent owners, have introduced new products and have offered some of them to dealers only as finished products.[13] If any dealer wanted to sell these types of products, ACS required them to purchase these products as finished products. (Northcutt Decl. in Opp'n to Pls.' Mot. for Summ. J. ¶¶ 4, 5.) This is in contrast to providing dealers with chemical concentrates where they would mix and manufacture the products themselves. Although the Dealer Contracts require Defendants to provide mixing formulas, they also provide that if a new product is made, and Defendants wish to market it, then the "Dealer shall have the right to represent the Company in Dealer's Territory *upon such terms as Company offers to others.*" (Cosgrove Decl. Exs. 1–7) (Dealer Contracts ¶ 11 (emphasis added).) Because new products are available only "upon such terms as Company offers to others," the relevant "terms" are the terms upon which the products are offered "to others." If Plaintiffs want to sell these kinds of products, it is uncontested that one of the "terms" that

---

13. In the late 1980s and early 1990s, ACS developed high-temperature warewashing products in the form of an encapsulated power, such as "Kleen Duty," "Kleen Duty Plus," "Auto–Kleen," and "Auto–Kleen Plus", or low-temperature warewashing detergents and powders, such as "Powdered Laundry Detergent," "Soak and Shine," Pink Bead," "Nu-Pan," "746 Solid," and "Excel." (Northcutt Decl. in Opp'n to Pls.' Mot. for Summ. J. ¶ 4.)

From 1995 though May 2002, ACS introduced floor care products, spot and stain removers, bathroom cleaners, and silverware cleaners that dealers must purchase as finished products. (Innes Decl. in Opp'n to Pls.' Mot. for Summ. J. ¶ 3.) As recent as last year, Auto–C introduced a highly concentrated low temperature warewashing line of products called "Mach 2 WashMate" which dealers must buy as a finished product. (*Id.* ¶ 4.)

they are being offered "to others" is that they be purchased as finished products. They do not have to buy these products and they are not entitled to the mixture formulas. Accordingly, the Court will deny Plaintiffs' Motion for Partial Summary Judgment in this regard.

## F. Overcharging

In their final contract claim, Plaintiffs assert that Defendants have been overcharging them for parts/equipment and chemical products. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 17–30.) The Dealer Contracts distinguish between the sale of parts/equipment and the sale of chemical products. With respect to parts/equipment, the 1971 Dealer Contract provides:

> Company agrees to sell F.O.B. Memphis, Tennessee, and Dealer agrees to buy from the Company, all necessary and integral parts of apparatus, devices and basic equipment, including automatic dishwashing machines, as available, necessary to efficiently operate the Auto–Chlor System for sanitizing and cleansing eating utensils.

(Cosgrove Decl. Exs. 2, 4, 5 (1971 Dealer Contract ¶ 3(a)).) The 1981 and 1984 Dealer Contracts, however, provide:

> Company agrees to sell F.O.B. Memphis, Tennessee, and Dealer agrees to buy from the Company, *virtually at cost*, all necessary and integral parts of apparatus, devices and basic equipment, including dishwashing machines, as available, necessary to efficiently operate the Auto–Chlor System for washing and sanitizing eating utensils....

(*Id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶ 3(a)) (emphasis added).) The difference is that the 1971 Contract leaves the price term open as to parts/equipment, while the 1981 and 1984 Contracts specify the price term as "virtually at cost." With respect to chemical products, each Dealer

Contract leaves the price term open. All that is said regarding the sale of chemical products is that the dealers "may purchase such chemical products from any source it may select," including, presumably, ACS. (*Id.* Exs. 1–7) (Dealer Contracts ¶ 3(c).)

Plaintiffs would have the Court read all of the Dealer Contracts to include the terms "virtually at cost" for all parts/equipment and all chemical products. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 18–19.) They argue that this is appropriate because no matter what the written agreements provide or do not provide, Plaintiffs "were repeatedly promised and assured that equipment and parts, chemicals and concentrates alike would be sold to them substantially at cost." (*Id.* at 18–19) (citing Cosgrove Decl. Exs. 51 (Donnell 8/5/2003 Dep. Tr. at 29:19–25); 71 (Vertin 7/23/03 Dep. Tr. at 20:12–21:17, 255:7–18); *see also id.* at 19 (citing Cosgrove Decl. Exs. 52) (M. Durham 7/31/03 Dep. Tr. at 170:18–171:14); 55 (Fakes 8/14/03 Dep. Tr. at 13:16–15:24, 24:1–21).)

The Court will not read "virtually at cost" into the Dealer Contracts where it does not exist. Each Dealer Contract is a separate agreement that was separately negotiated. The parties agreed that only *parts/equipment purchased pursuant to the 1981 and 1984 Dealer Contracts* be sold "virtually at cost." To read the contracts as Plaintiffs suggest would be to rewrite the agreements. Courts "will not remake the contract or add a condition which was not written into it." *McGuirk Oil Co., Inc. v. Amoco Oil Co.*, 889 F.2d 734, 737 (6th Cir.1989) (citation and internal quotations omitted). Instead, the Court's task is to "ascertain the intention of the parties based upon ... the contractual language" and "the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin*, 78 S.W.3d at 889–90 (emphasis add-

ed). Although Plaintiffs have argued that they were all told that Defendants would sell everything "virtually at cost," the parties only contracted for "virtually at cost" in the one instance. As noted above, Defendants' statements about their sales policy cannot alter or modify their contractual obligations.[14] (Cosgrove Decl. Exs. 2, 4, 5 (1971 Dealer Contract ¶ 9); *id.* Exs. 1, 3, 6, 7 (1981, 1984 Dealer Contracts ¶¶ 9, 17)); *see* Tenn. Stat. § 47–2–209(1); *Knoxville Rod,* 672 S.W.2d at 207–08. Having determined that the Dealer Contracts cannot be modified, the Court will consider the provisions with open price terms separately from those that specify the price as "virtually at cost." The Court will begin with the open price terms.

### 1. Open Price Terms

The 1971 Dealer Contract does not contain price terms for parts/equipment or chemicals products, and the 1981 and 1984 Dealer Contracts do not contain price terms for chemical products. Tennessee law, which tracks the UCC, implies a good faith component in any contract with an open price term. Specifically,

> [t]he parties, if they so intend, can conclude a contract for sale even though the price is not settled. In such as case the price is a reasonable price at the time of delivery if ... nothing is said as to price.... A price to be fixed by the seller or by the buyer means a price for him to fix in good faith.

Tenn. Stat. § 47–2–305.

The meaning of "good faith" is defined in several other sections of the UCC. The definitions section explains good faith as "honesty in fact in the conduct or transaction concerned." *Id.* § 47–1–201(19). Wherever the term "good faith" is used throughout the code, it means "at least what is here stated." *Id.* § 47–1–210(19) cmt. 19. Additional meaning to the term may be added within a given article. *Id.* Section 47–2–103, regarding merchants, further explains the term: " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."[15] *Id.* § 47–2–103(1)(b). Thus, for a merchant-seller to fix an open price term in "good faith," it must do two things: (1) be honest in fact, and (2) observe "reasonable commercial standards of fair dealing in the trade." If the merchant fails to do either, it lacks good faith. *See Allapattah Servs., Inc. v. Exxon Corp.,* 61 F.Supp.2d 1308, 1322 (S.D.Fla.1999) ("Pursuant to the UCC, as a merchant [the seller's] duty of good faith to its dealers meant factual honesty *and* the observance of reasonable commercial standards of fair dealing in the trade. UCC § 2–103(b). Thus, good faith consists of two separate components, both of which must be satisfied." (emphasis in original)); 1A Ronald A. Anderson, *Anderson on the Uniform Commercial Code* 3d § 2–103:63 (1996) ("[G]ood faith means honesty in fact and in the case of a merchant *also requires* 'the observance of reasonable commercial standards of fair dealing in the trade.' " (emphasis added)).

Focusing on the "reasonable commercial standards" component of "good faith," Defendants contend that Plaintiffs cannot "prove that Auto–Chlor System's prices ... have not been commercially reasonable." (Defs.' Br. in Supp. of Summ. J.

---

**14.** Although Defendants' statements concerning sales "virtually at cost" cannot alter the terms of the Dealer Contracts, their statements may be relevant in determining Defendants' "good faith" in setting prices with respect to open price terms. (*See infra* Analysis Part I.F.1.)

**15.** Neither side disputes that Defendants are merchants under the UCC. *See* Tenn. Stat. 47–2–104(1).

at 31.) The Court agrees. To show that Defendants did not observe "reasonable commercial standards of fair dealing" in the commercial dishwashing industry, Plaintiffs must "produce background evidence of the manner in which other marketers" of parts/equipment and chemicals similar to that of Defendants "set their prices." *Tom–Lin Enters., Inc. v. Sunoco, Inc. (R & M)*, 349 F.3d 277, 282 (6th Cir.2003) (applying Ohio UCC); *see;* 1A Ronald A. Anderson, *Anderson on the Uniform Commercial Code* 3d § 2–103:80 (1996) ("A court cannot find that a merchant . . . did not observe reasonable 'commercial standards of fair dealing in the trade' when there is no evidence in the record as to what the standards of the trade were."). "Such evidence is critical: a jury may not decide in a vacuum whether a particular price for a particular item in a particular industry is appropriate." *Schwartz v. Sun Co., Inc. (R & M)*, 276 F.3d 900, 905 (6th Cir.2002) (applying Michigan UCC). Plaintiffs have failed to introduce any evidence against which the commercial reasonableness of the prices Defendants had charged them could be

assessed. The only evidence Plaintiffs provide is that Defendants charged its branches different prices than it charged them. But "the naked fact of [Defendants'] price discrimination" is insufficient. *Id.*

■ Turning to the "honesty in fact" component of "good faith," Defendants have not carried their burden of showing that the material facts in this case are undisputed. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. "[A] party seeking summary judgment always bears the initial responsibility of . . . identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Defendants have ignored the "honesty in fact" component of "good faith," and have provided no argument as to why summary judgment is appropriate on this issue.[16] Due to the Defendants' failure to meet its initial burden, "the onus never passed to [Plaintiffs] to set forth specific facts showing that

---

**16.** Defendants rely heavily on *Tom–Lin*, in which the Sixth Circuit analyzed "good faith" under Ohio law. In that case, the court stated that in order to show that a merchant-seller lacks good faith, it must be shown that "[1] the price was not fixed in a commercially reasonable manner and, [2] that the pricing was commercially unjustifiable." *Tom–Lin*, 349 F.3d at 281. The phrase "commercially unjustifiable" was used instead of "honesty in fact" because Ohio courts have determined that under its version of UCC 1–201(19) "honesty in fact does not exist when the actions at issue are 'commercially unjustifiable.'" *Id.* (citing *Master Chem., Corp. v. Inkrott*, 55 Ohio St.3d 23, 563 N.E.2d 26, 31 (1990)). The Court has no quarrel with this reading of Ohio law, but Tennessee law is not the same. The Tennessee Supreme Court has defined the "honesty in fact" standard to mean "an absence of a 'knowing or reckless disregard of a customer's rights.'" *The Bank/First Citizens Bank v. Citizens and Associates,* 82 S.W.3d

259, 264 (Tenn.2002) (citing *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546, 549 (Tenn. 1996) (defining "good faith" in section 47–1–201(19))). Under Tennessee's definition of "honesty in fact," the Court finds that genuine issues of material act exist (even though the onus never passed to Plaintiffs to set forth specific facts showing that there is a genuine issue for trial). For example, if Plaintiffs were told that they were paying "virtually at cost" for parts/equipment and chemical products under the Dealer Contracts with open price terms, (*see* Pls.' Resp. to Defs.' Mot. for Summ. J. at 18–19 (citing Cosgrove Decl. Exs. 51) (Donnell 8/5/2003 Dep. Tr. at 29:19–25); 52 (M. Durham 7/31/03 Dep. Tr. at 170:18–171:14); 55 (Fakes 8/14/03 Dep. Tr. at 13:16–15:24, 24:1–21); 71 (Vertin 7/23/03 Dep. Tr. at 20:12–21:17, 255:7–18)), but they were not in fact charged "virtually at cost," then it becomes a jury question whether Defendants were honest in fact.

there is a genuine issue for trial" with respect to honesty in fact. *Handeen v. Lemaire*, 112 F.3d 1339, 1346 (8th Cir. 1997) (citation and internal quotations omitted).

> Only after the moving party fulfills its duty is the nonmoving party obliged to proffer evidence that contradicts the moving party's showing and that proves the existence of a genuine issue of material fact.... [E]ven when the non-movant bears the burden of proof at trial, simply filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case.... Any contrary rule would be fundamentally unfair and would permit a defendant, with very little effort on its own part, to place upon a plaintiff an unwarranted responsibility to substantiate each element of its case or face summary dismissal.

*Id.* at 1346–47 (citations and internal quotations omitted). Accordingly, the Court will deny Defendants' motion with respect to Plaintiffs' overcharging claims based on sales with the open price terms; these claims will proceed to trial, but the issue will be limited to the "honesty in fact" component.

## 2. "Virtually at Cost"

■ The 1981 and 1984 Dealer Contracts specify that Defendants will sell parts/equipment to Plaintiffs "virtually at cost." As such, and contrary to Defendants' assertions, Tenn. Stat. § 46–2–305 is inapplicable because the price term is not left open. In construing "virtually at cost," the Court is to "ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Planters Gin,* 78 S.W.3d at 890. "[V]irtually at cost" is not defined in the Dealer Contract. The dictionary definition of "virtually" is (1) "in essence: not merely formally," or (2) "almost entirely: for all practical purposes." *Webster's Third New International Dictionary* 2556. "Cost" is defined as "the amount or equivalent paid ... for anything bought." *Id.* at 515. Thus, "virtually at cost" means "in essence ... the amount or equivalent paid for anything bought." The clear intent expressed by "virtually at cost" is that Defendants are to sell parts/equipment at a price that is near their cost.

There is a factual issue as to whether Defendants breached their obligation to sell parts/equipment "virtually at cost." There is evidence that Defendants treated the branches and the dealers the same (*see* Cosgrove Decl. Exs. 58 (Griesbeck Dep. Tr. at 54:7–24); 59 (Harding Dep. Tr. at 24:6–26:1)), and that the prices Defendants charged the branches for parts/equipment was the Defendants' cost (*id.* Ex. 70 (Tucker Dep. Tr. at 30, 98–103, 118–19)). If the dealers and branches were treated the same, and the branches paid ACS's cost, then the dealers should also have paid near ACS's cost. But there is evidence that ACS would double the labor rate for parts sold to the dealers (*id.* Ex. 70 (Tucker Dep. Tr. at 104–105)), and then "use[ ] a factor anywhere from two to three times to come up with a final cost," (*id.* Ex. 70 (Tucker Dep. Tr. at 106)). Moreover, there is evidence that branches paid "thirteen hundred ... whatever [ACS's] cost was" for dishwashing machines, while the dealers paid "in the seventeen, eighteen hundred dollar range." (*Id.* Ex. 70 (Tucker Dep. Tr. at 118–19).) In sum, if the branches paid whatever ACS's cost was for parts/equipment, but Plaintiffs paid more than the branches, then a reasonable jury could find that whatever Defendants charged Plaintiffs was not "virtually at cost."

### 3. Summary of Plaintiffs' Overcharging Claims

As a result of the foregoing, the parties will proceed to trial on Plaintiffs' overcharging claims. With respect to all alleged overcharges coming under Dealer Contracts with open price terms—parts/equipment and chemical products under the 1971 Dealer Contract and chemical products under the 1981 and 1984 Dealer Contracts—the issue at trial will be whether DiverseyLever and Auto–C fixed prices with "honesty in fact" in accordance with the UCC. With respect to all alleged overcharges coming under the 1981 and 1984 Dealer Contracts with the fixed price term of "virtually at cost" for the sale of parts/equipment, the issue at trial will be whether DiverseyLever and Auto–C breached their obligations to sell "virtually at cost."

### G. Defendants' Defenses

Defendants argue that Plaintiffs' overcharging claims are barred by the statute of limitations, waiver, voluntary payment, and laches. (Defs.' Br. in Supp. of Mot. for Summ. J. at 31–33.)

### 1. Statute of Limitations

"An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued." Tenn. Stat. § 47–2–725(1). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.* § 47–2–725(2). Although the statute of limitations will not bar Plaintiffs' overcharging claims that are less than four years old, it will bar those that are older. 4B Lary Lawrence, *Lawrence's Anderson on the Uniform Commercial Code* 3d § 2–725.82 (2001) ("[A] claim by the buyer that the seller overcharged the buyer is ... subject to UCC § 2–725."). As to the older claims, Plaintiffs seek to avoid the bar on the ground that Defendants fraudulently concealed Plaintiffs' cause of action. (Pls.'s Resp. to Defs. Mot. for Summ. J. at 24.)

The law in Tennessee respecting the fraudulent concealment of a cause of action has been summarized as follows:

> Generally, a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite exercising reasonable diligence.... Generally, the affirmative action on the part of a defendant must be something more than mere silence or a mere failure to disclose known facts. There must be some trick or contrivance intended to exclude suspicion and prevent inquiry, or else there must be a duty resting on the party knowing such facts to disclose them.

*Benton v. Snyder,* 825 S.W.2d 409, 414 (Tenn.1992) (citations omitted); *see Soldano v. Owens–Corning Fiberglass Corp.,* 696 S.W.2d 887, 889 (Tenn.1985).

██ Plaintiffs have failed to raise a genuine issue of material fact with respect to fraudulent concealment. Plaintiffs rely on a May 2001 email written by Kirk Northcutt, then Vice President for Dealer Development at DiverseyLever (Northcutt Decl. ¶ 2), and on the deposition testimony of Gregory Chapman and Robert Tucker. (*See* Pls.' Resp. to Defs.' Mot. for Summ. J. at 24.) Nothing in Northcutt's email or in Chapman's testimony, however, reveals any affirmative action by Defendants to conceal their alleged overcharging. (*See* Cosgrove Decl. Exs. 34 (Northcutt Email), 50 (Chapman Dep. Tr. at 36:18–37:9).) And although Tucker admitted that he personally did not advise Plaintiffs that there were different price lists for branches and dealers (*id.* Ex. 70 (Tucker Dep. Tr. at 98:23–99:14)), his testimony does not reveal that the Defendants applied "some

trick or contrivance" intending to have this information concealed, *Benton,* 825 S.W.2d at 414. Furthermore, Plaintiffs have not demonstrated that they could not have otherwise discovered the alleged overcharging despite exercising reasonable diligence. *Id.* Therefore, the statute of limitations was not tolled as to Plaintiffs' overcharging claims that are more than four years old.

### 2. Waiver

■■■■■■ Defendants also contend that Plaintiffs have waived their overcharging claims because they knew of, and complained about, high prices in the past. (Defs.' Br. in Supp. of Mot. for Summ. J. at 8–9, 31–33; Defs.' Reply Br. in Supp. of Defs.' Mot. for Summ. J. at 14–15.) "A waiver is a voluntary relinquishment by a party of a known right. . . . [I]t may be proved by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by a course of acts and conduct." *Gaston v. Tennessee Farmers Mut. Ins. Co.,* 120 S.W.3d 815, 819 (Tenn.2003) (citations and internal quotations omitted). "The acts or course of conduct referred to 'must be clear, unequivocal and decisive acts of the party or an act which shows determination not to have the benefit intended in order to constitute a waiver.'" *Knoxville Rod,* 672 S.W.2d at 208 (quoting *Gitter v. Tennessee Farmers Mut. Ins. Co.,* 450 S.W.2d 780, 784 (Tenn.1969)). Whether a party has waived a right "is a question of fact for the jury." *Gaston,* 120 S.W.3d at 819 (citations omitted); *see also Renfro v. Swift Eckrich, Inc.,* 53 F.3d 1460, 1464 (8th Cir.1995) ("Whether a party has waived its rights under a contract presents a question of fact.")

It is a fact question whether Plaintiffs waived their claims for overcharging. Although Plaintiffs' complaints could be viewed as manifesting an intent and purpose not to claim breach of contract, other reasonable inferences could also be drawn. Complaining about high prices is not always the equivalent of waiving one's right to claim breach of contract. Were it otherwise, every time a party to a contract felt it was being overcharged, it would have to file a lawsuit instead of complaining to the other party for fear of a waiver. It is perfectly consistent, to the Court's way of thinking, for a party to object to prices that are higher than desirable, but are yet not so high as to breach the contract. The Court cannot say that Plaintiffs' complaints are so "clear, unequivocal and decisive" so as to constitute a waiver. *Knoxville Rod,* 672 S.W.2d at 208.

To the extent Plaintiffs intended to waive their rights by their complaints, it does not follow that they have waived their rights for all time. To the contrary, the Dealer Contracts provide that:

> Failure of either party at any time to require performance of any provisions of this Contract shall not affect the right to require full performance thereof at any time thereafter and the waiver by either party of a breach of any such provision shall not be taken or held to be a waiver of any subsequent breach thereof or as nullifying the effectiveness of such provisions.

(Cosgrove Decl. Exs. 1–7 (Dealer Contracts ¶ 8).) In support of their waiver defense, Defendants rely on *Murphy Oil USA, Inc. v. Brooks Hauser,* 820 F.Supp. 437, 442 (D.Minn.1993). (Defs.' Br. in Supp. of Mot. for Summ. J. at 32.) Although *Murphy Oil* correctly applied Minnesota law by holding that a party's continued recognition of a contract as binding after the other party's alleged breach acts as a waiver of that breach, 820 F.Supp. at 442, the contract in *Murphy Oil* did not contain a provision similar to paragraph 8 of the Dealer Contracts at issue here. In paragraph 8, Plaintiffs and De-

fendants specifically agreed that a failure to require performance of any provisions of the agreement "shall not be taken or held to be a waiver of any subsequent breach." (Cosgrove Decl. Exs. 1–7 (Dealer Contracts ¶ 8).) While a jury could reasonably find that Plaintiffs waived some breaches at some point in time, it cannot be said that Plaintiffs have waived all breaches at all points in time. Accordingly, Defendants' reliance on *Murphy Oil* in the face of the unambiguous language of the Dealer Contracts is misplaced and whether Plaintiffs waived their overcharging claims is a fact issue for the jury.

### 3. Voluntary Payment

 Defendants next contend that Plaintiffs' overcharging claims are barred by the voluntary payment rule. (Defs.' Br. in Supp. of Mot. for Summ. J. at 32.) This rule "provides that where one makes a voluntary payment with knowledge of all relevant facts, and then sues to recover that payment, there generally can be no recovery, even if there was no legal liability to pay in the first place." *Pratt v. Smart Corp.*, 968 S.W.2d 868, 871 (Tenn. Ct.App.1997) (citing *Roach v. Underwood*, 192 Tenn. 378, 241 S.W.2d 498, 499 (1951)). Money paid under mistake of fact, however, "may be recovered," *State v. Bennett*, 181 Tenn. 196, 180 S.W.2d 891, 894 (1944), and "[t]he payment of a bill under a mistake of fact is not a waiver of the right to a refund [of] overcharges discovered thereafter," *Schmidt v. Dixon*, 694 S.W.2d 319, 322 (Tenn.Ct.App.1985) (citations omitted). "Generally, a mistake of fact ... is such error or want of knowledge as to a fact, past or present, or such belief in the past or present existence as a fact of that which never existed ... as that ... knowledge of the fact, or of its existence or non-existence, would have caused the payor to refrain from making the payment." 70 C.J.S. *Payment* § 115; *see* 66 Am.Jur.2d *Restitution and Implied Contracts* § 134.

Plaintiffs contend that they did not have knowledge of all relevant facts when they made payments to Defendants. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 23–24.)

There is a genuine issue of material fact as to whether Plaintiffs made payments "with knowledge of all relevant facts." *Pratt*, 968 S.W.2d at 871. Viewed in a light most favorable to Plaintiffs, the evidence shows that Plaintiffs held a "belief in the past or present existence as a fact of that which never existed"—namely, that Defendants fixed prices in good faith for those items with open price terms and charged them "virtually at cost" for items sold under that term. As such, "[m]oney [they] paid under mistake of fact may be recovered." *Bennett*, 180 S.W.2d at 894. Given the many years of alleged overcharges, the potentially large number of overcharges incurred, and the eight Plaintiffs who claim these overcharges, this issue is not appropriate for summary disposition. Based on this record, the Court cannot say that no reasonable jury could find that Plaintiffs made a voluntary payment with knowledge of all relevant facts.

In support of their voluntary payment defense, Defendants rely on *Putnam v. Time Warner Cable*, 255 Wis.2d 447, 649 N.W.2d 626, 633–34 (2002). (*See* Defs.' Br. in Supp. of Mot. for Summ. J. at 32.) In *Putnam*, plaintiffs challenged a $5.00 late-payment fee imposed by their cable provider. 649 N.W.2d at 629. The fee was written into their cable contract as liquidated damages. *Id.* at 630, 649 (Bablitch, J., dissenting). The court held that the voluntary payment rule barred plaintiffs from recovering the fees they paid. *Id.* at 629. In so holding, the court found that plaintiffs "possessed full knowledge of the $5.00 late fee and of the circumstances under which they would be exposed to it." *Id.* at 633.

There is a key factual distinction between *Putnam* and this case. While the fee in *Putnam* was an express term that plaintiffs knew they would be charged if they did not timely pay their bill, Plaintiffs' Dealer Contracts contain open price terms with prices fixed by Defendants and a fixed price term of "virtually at cost." As noted above, factual issues exist as to whether Defendants' pricing breached their obligations under the contracts and Tennessee's UCC. Viewed in a light most favorable to Plaintiffs, the evidence shows that Plaintiffs did not know all the relevant facts underlying the prices they paid. Had Plaintiffs known that Defendants did not price items in good faith or that Defendants did not price parts and equipment under the 1981 and 1984 Contracts "virtually at cost," and made voluntary payment anyway, then their claims would be barred by the rule. This does not, as Defendants assert, "tacitly suggest that all demands for payment in business transactions ... need to be accompanied by an itemized list explaining the basis for each charge." (Defs.' Br. in Supp. of Mot. for Summ. J. at 32 n. 13) (quoting *Putnam*, 649 N.W.2d at 634). Rather, this determination attempts to harmonize Defendants' contractual and UCC obligations with the voluntary payment rule. Accordingly, whether Plaintiffs' claims are barred by the voluntary payment rule is a fact issue for the jury.

### 4. Laches

▮ Defendants' final defense is laches. (Defs. Br. in Supp. of Summ. J. at 32.) The doctrine of laches is summarized as follows:

Relief is generally refused by courts of equity, because of lapse of time, only in such cases where the loss of evidence, death of witnesses or parties, and failure of memory resulting in the obscuration of facts to the prejudice of the defendant, render uncertain the ascertainment of truth, and make it impossible for the court to pronounce a decree with confidence.... The doctrine of laches ... is not an arbitrary or technical doctrine. No hard and fast rule for its application can be formulated.

*John P. Saad & Sons v. Nashville Thermal Transfer Corp.*, 715 S.W.2d 41, 46 (Tenn.1986) (citations and internal quotations omitted). Laches does not bar Plaintiffs' overcharging claims. By operation of the statute of limitations, their claims are limited to those accruing in the last four years. There is nothing in the record suggesting that evidence has been lost or that memories have so faded as to obscure the facts. And although Robinson has passed away, other witnesses are able to testify.[17]

## II. Tortious Interference

Plaintiffs allege that Defendants tortiously interfered with performance of their contracts and tortiously interfered with their prospective contractual relations with others. (RFAC Second and Third Claims; Pls.' Resp. to Defs.' Mot. for Summ. J. at 43–46, 52–53.) Section 766 of the Restatement (Second) of Torts defines tortious interference with the performance of contracts as follows:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) when tied to a specific contract provision. *Lawhorn*, 917 F.Supp. at 543. Of course, good faith is at the heart of the breach of contract claims alleged here with respect to open price terms.

---

**17.** Given that Plaintiffs' overcharging claims survive summary judgment, Plaintiffs can also proceed on their implied covenant of good faith and fair dealing claim in relation to the alleged overcharges. Although it is not an independent cause of action, it can be utilized

between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766; *see, e.g., Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 506 (Minn.1991). To prevail on this claim, Plaintiffs must show, *inter alia*, that Defendants intentionally and improperly induced or otherwise caused a third person not to perform a contract. *See* Restatement (Second) of Torts § 766.

Section 766B of the Restatement (Second) of Torts defines tortious interference with prospective contractual relations as follows:

One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from the loss of the benefits of the relation, whether the interference consists of

(a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or

(b) preventing the other from acquiring or continuing the relation.

Restatement (Second) of Torts § 766B; *see, e.g., United Wild Rice, Inc. v. Nelson*, 313 N.W.2d 628, 632–33 (Minn.1982). To prevail on this claim, Plaintiffs must show, *inter alia*, that Defendants intentionally and improperly caused a third party not to enter a contractual relation or prevented Plaintiffs from acquiring the relation.[18] *See* Restatement (Second) of Torts § 766B. In determining whether an actor's conduct is improper "greater protection is given to the interest in an existing contract than to the interest in acquiring prospective contractual relations, and as a result permissible interference is given a broader scope in the latter instance." Restatement (Second) of Torts § 767 cmt j.

Defendants have challenged each of Plaintiffs' tortious interference claims—some 98 in all by Defendants' count—on various grounds. (Defs.' Br. in Supp. of Summ. J. at 36–47; *see* Gierke Decl.) Plaintiffs, however, have only responded to a fraction of the claims. (*See* Pls.' Resp. to

---

**18.** Section 767 of the Restatement (Second) of Torts sets forth seven factors used to determine whether conduct is improper:

In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

Restatement (Second) of Torts § 767.

Section 768 of the Restatement (Second) of Torts provides a specific application of the tortious interference for competitors:

(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) of Torts § 768.

Defs.' Mot. for Summ. J. at 43–46, 52–53.) Instead, they state that they "will offer to the jury evidence from the individual Plaintiffs of the disruption they have encountered to their business at Defendants' hands ... [and] will offer to the jury evidence of specific instances where Defendants have impeded or attempted to impede Plaintiffs' ability to conduct business with respect to particular customers or prospective customers." (*Id.* at 45.) This is an insufficient response to the summary judgment motions; Plaintiffs must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. *See Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Krenik,* 47 F.3d at 957. Thus, to the extent Plaintiffs have failed to respond, the Court will grant Defendants summary judgment on those claims. *See Graham v. Rosemount, Inc.,* 40 F.Supp.2d 1093, 1101 (D.Minn.1999). Turning to the claims to which Plaintiffs did respond, the Court will start with their tortious interference with performance of contract claims.

## A. Tortious Interference With Performance of Contract

As noted, to prevail on this claim, Plaintiffs must show, *inter alia,* that Defendants intentionally and improperly induced or otherwise caused a third person not to perform a contract with them. Restatement (Second) of Torts § 766. The evidence Plaintiffs have presented, however, does not support their claims.[19]

With one exception,[20] Plaintiffs' tortious interference with performance of contract claims fail to show a breach of contract. First, although ACS–Denver was ordered by Auto–C to transfer two existing Rip Griffins Travel Centers accounts to John-

sonDiversey (Pls.' Reps. to Defs. Mot. for Summ. J. at 44–45) (citing Cosgrove Decl. Ex. 39 (White Aff.)), it still continues to serve both accounts (Gierke Decl. ¶ 5(c), Ex. 3 (White/Stewart 3/28/03 Dep. Tr. at 528–29, 563–64)). Second, while one of ACS–Minnesota's accounts, Life Time Fitness, Inc., received bills from Diversey-Lever in October 2002 (Pls.' Reps. to Defs. Mot. for Summ. J. at 45) (Cosgrove Decl. Ex. 40 (Noel Decl.)), ACS–Minnesota lost the account as a result of unrelated circumstances (*see* Gierke Decl. ¶ 5(f), Ex. 2 (Malpass Dep. Tr. at 148:4–150:13)). Third, although one of ACS–Denver's customers, Bennett's Barbeque of Englewood, Colorado, was told by a DiverseyLever representative that DiverseyLever was ACS–Denver's parent company and could provide better prices (Pls.' Reps. to Defs. Mot. for Summ. J. at 46) (citing Cosgrove Decl. Ex. 41 (Huggins Decl.)), ACS–Denver did not lose the account (Gierke Decl. ¶ 4, Ex. 3 (White/Stewart 3/28/03 Dep. Tr. at 445–46)). Finally, while a DiverseyLever representative was rude to a Golden Light customer, Days Inn of Taos, New Mexico, and allegedly vandalized a wash machine (Pls.' Reps. to Defs. Mot. for Summ. J. at 46) (citing Cosgrove Decl. Ex. 43 (Fair Decl.)), Golden Light did not lose the customer's account (Gierke Decl. ¶ 5(c), Ex. 6 (Poole Dep. Tr. at 166:22–168:4)).

▪ With respect ACS–West Texas, it asserts that DiverseyLever approached one of its customers, Park Plaza Nursing Center of San Angelo, Texas, offering it dishwashing chemicals and services at a lower price. Because of this offer, the customer stopped doing business with ACS–West Texas. But nine months later, the customer went back to ACS–West Tex-

---

19. Plaintiffs do not specify in their memorandum which facts go to which tortious interference claim. Thus, the Court has organized the claims under the most appropriate tort.

20. ACS–West Texas's arguments will be addressed below.

as. Although DiverseyLever threatened the customer with litigation to enforce its contract, the threat did not deter the customer from going back to ACS–West Texas and DiverseyLever ultimately did not pursue litigation. (Pls.' Reps. to Defs. Mot. for Summ. J. at 46; Cosgrove Decl. Ex. 42 (Loudermilk Decl.); Gierke Decl. ¶ 5(c), Ex. 5 (McPhail 8/7/03 Dep. Tr. at 145–47).) Although ACS–West Texas lost the customer for nine months, Diversey-Lever's conduct was not improper. Under § 768 of the Restatement, to be improper a competitor's actions must be, *inter alia,* "wrongful." Restatement (Second) of Torts § 768(1)(b). "Wrongful means" include physical violence, fraud, civil suits, and criminal prosecutions. *See, e.g., Amoco Oil v. Ervin,* 908 P.2d 493, 502 (Colo. 1995) (collecting cases). By offering better prices, DiverseyLever's conduct cannot be considered "wrongful" under the Restatement.

▮ Plaintiffs also allege that Defendants tortiously interfered with its performance of contract by acquiring a competitor—Americlean. (Pls.' Resp. to Defs.' Mot. for Summ. J. 52–53.) In support, Plaintiffs rely on *Gossard v. Adia Servs., Inc.,* a case where Richard *Gossard* had a franchise agreement with Nursefinders, Inc. that specified that neither Nursefinders, its parent, nor its affiliates would provide similar services in Gossard's territory. 723 So.2d 182, 183 (Fla.1998). Nursefinders was then purchased by Adia Services, Inc. Later, Adia purchased Star–Med, a competitor of Gossard's located in Gossard's territory. *Id.* at 183–84. Consequently, Star–Med became Nursefinders' affiliate by virtue of their common parent, Adia. *Id.* at 184. The court held that because of Adia's purchase of Star–Med, Nursefinders had "no choice" but to breach its agreement with Gossard. *Id.* Thus, Adia's conduct constituted tortious interference with performance of contract under § 766. *Id.* at 185.

There is a critical factual difference in this case, however, that distinguishes it from *Gossard. See Voice–Tel Enterprises, Inc. v. JOBA, Inc.,* 258 F.Supp.2d 1353, 1369 (N.D.Ga.2003). In the Dealer Contracts, ACS promised that Plaintiffs would have an exclusive territory to use ACS's trademarks and products. Unlike Nursefinders in *Gossard,* ACS did not promise that no affiliate or parent would compete with Plaintiffs in the sense of using non-Auto-Chlor trademarks or products. As noted above, there is a difference in scope between a non-compete agreement and an exclusive territory—a difference that Plaintiffs themselves all recognized in their Dealer Contracts. (*Cf.* 1971, 1981, 1984 Dealer Contracts ¶ 1, *with* 1971 Dealer Contract ¶ 5(d) and 1981, 1984 Dealer Contracts ¶ 5(f).) Therefore, *Gossard* is inapplicable in this case.

Accordingly, because Plaintiffs have not generated a genuine issue of material fact as to their tortious interference with performance of contract claims, the Court will grant Defendants summary judgment.[21]

## B. Tortious Interference With Prospective Contractual Relations

▮ As noted, to prevail on a claim of tortious interference with prospective contractual relations, Plaintiffs must show, *inter alia,* that the Defendants intentionally and improperly interfered with a prospec-

---

**21.** The Court will also grant Defendants summary judgment on Plaintiffs' Eighth Claim, which alleges an unlawful inducement of breach of contract in violation of Tenn. Stat. § 47–50–109. As noted above, Plaintiffs have shown no unlawful inducement of breach of contract. *See Carruthers Ready–Mix, Inc. v. Cement Masons Local Union 520,* 779 F.2d 320, 323 (6th Cir.1985).

tive contractual relationship. Restatement (Second) of Torts § 766B.

Plaintiffs first argue that Defendants told them "to back off potential customers" that were doing business with Diversey-Lever or JohnsonDiversey. (Pls.' Reps. to Defs. Mot. for Summ. J. at 44.) Plaintiffs cite the following September 2002 "culture of cooperation" letter from Tom Gartland of JohnsonDiversey in support:

> Now that Auto–Chlor (Auto–C LLC) is a subsidiary of JohnsonDiversey, I want to emphasize our desire to maximize our competitive efforts toward competitors like Ecolab. Our market is becoming more and more competitive, and we need to focus all of our sales resources on our real competitors. To help achieve this goal, JohnsonDiversey has asked its sales force not to knowingly solicit business being served by an Auto–Chlor dealer. If a JohnsonDiversey sales representative learns that an Auto–Chlor dealer's customer is dissatisfied with the servicing dealer, the sales representative will give the affected Auto–Chlor dealer a chance to satisfy the customer and keep the business. Only if those efforts fail will the JohnsonDiversey sales representative pursue the customer. Auto–Chlor asks that its independent dealers extend the same courtesies to JohnsonDiversey and focus their sales efforts on customers being served by unaffiliated companies like Ecolab.
>
> In the period ahead of us, we want to provide our Auto–Chlor dealers with greater opportunities to increase their sales, and our ability to do so will be enhanced through a culture of cooperation between JohnsonDiversey and the Auto–Chlor dealers.

(Cosgrove Decl. Ex. 29.) This is substantially the same as the "cooperative approach" proposed by DiverseyLever in December 1998. (*See id.* Ex. 21, ¶¶ 1, 4.) Only ACS–Fresno, ACS–Minnesota, and ACS–Albuquerque, however, followed this proposal.[22] (Pls.' Resp. to Defs.' Mot. for Summ. J. at 44–45.) ACS–Kansas, Golden Light, ACS–Jacksonville, ACS–West Texas, and ACS–Denver decided not to go along. (Brenner Supp. Decl. ¶ 18, Ex. 3 (Poole 8/4/03 Dep. Tr. at 180–81); *id.* ¶ 18, Ex. 5 (R. Durham 8/1/03 Dep. Tr. at 199:12–19); *id.* ¶ 18, Ex. 8 (McPhail 8/3/03 Dep. Tr. at 309:6–310:3); Cosgrove Decl. Ex. 72 (White/Stewart 8/27/03 Dep. Tr. at 272:17–20, 277:12–16).)

Plaintiffs have not generated a genuine issue of material fact that Defendants "prevent[ed] [them] from acquiring or continuing the prospective relation." Restatement (Second) of Torts § 766B(b). The "culture of cooperation" or the "cooperative approach" suggested by JohnsonDiversey and DiverseyLever was voluntary. As reflected by the fact that five of the eight Plaintiffs did not participate in either proposal, it cannot be credibly said that Defendants prevented Plaintiffs from entering into whatever contractual relations they wanted.

▬ Next, ACS–Denver asserts that it was told not to call on DiverseyLever cus-

---

**22.** ACS–Fresno did not enter into a contractual relationship with the Piccadilly Inn in Fresno, California, because it was a DiverseyLever account. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 44) (citing Cosgrove Decl. Ex. 57 (Green Dep. Tr. at 15:1–16:9).) ACS–Minnesota's Anthony Vertin went along with the proposal "for a period of time," but did not cite any contractual relationships that ACS–Minnesota did not enter into. (*Id.*) (citing Cosgrove Decl. Ex. 71 (Vertin Dep. Tr. at 280:15–282:14).) Finally, ACS–Albuquerque did not enter contractual relationships with the Sandoval Detention Center in Sandoval County, New Mexico or the Radisson Hotel in Santa Fe, New Mexico, because they were DiverseyLever customers and DiverseyLever promised those customers better prices. (*Id.*) (citing Cosgrove Decl. Ex. 38 (Buser Decl.).)

tomers or else DiverseyLever would "put on a blitz," meaning that DiverseyLever would call on ACS–Denver's customers in an attempt to get their business. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 44 (citing Cosgrove Decl. Exs. 72 (White/Stewart 8/28/03 Dep. Tr. at 535–58); 37 (Stewart Decl. ¶¶ 2, 3)).) In response, ACS–Denver stopped calling on those customers. (Cosgrove Decl. Exs. 72 (White/Stewart 8/28/03 Dep. Tr. at 542–43).) ACS–Denver's claim fails, however, because DiverseyLever's competitive efforts were not improper. *See, e.g., Ervin*, 908 P.2d at 502.

Finally, ACS–Minnesota alleges that DiverseyLever interfered with its prospective contractual relations with Khan's Mongolian Barbeque. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 45) (citing Cosgrove Decl. Ex. 62 (Malpass Dep. Tr. at 194:23–196:15).) But because it admits that Khan's became its customer (Cosgrove Decl. Ex. 62 (Malpass Dep. Tr. at 196:16–20)), ACS–Minnesota was not prevented from a prospective relation.

Accordingly, because Plaintiffs have failed to show that Defendants prevented them from acquiring or continuing prospective relations and failed to show that Defendants' conduct was improper, the Court will grant Defendants summary judgment on these claims.[23]

### III. Statutory Violations

In addition to their tortious interference claims, Plaintiffs assert claims under the Lanham Act for false designation of origin, false description, and palming off in violation of 15 U.S.C. § 1125(a). They make

related claims under the New Mexico Unfair Practices Act, New Mexico Stat. § 57–12–2, the Colorado Consumer Protection Act, Colo. Stat. § 6–1–105, and common law unfair competition. Finally, they assert a claim under the Minnesota Franchise Act, Minn.Stat. § 80C.14. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 53–54.) The Court will begin with Plaintiffs' Lanham Act claim.

Section 1125(a) provides that:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1). This section provides two distinct claims: false designation of origin and false advertising. *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 259 (2d Cir.2002).

---

**23.** Plaintiffs also assert that "Defendants have routinely provided detailed information regarding the [dealers] to the former Americlean division of their business." (Pls.' Resp. to Defs.' Mot. for Summ. J. at 43) (citing Cosgrove Decl. Ex. 53 (R. Durham 12/1/03 Dep. Tr. at 278:11–18, 300:21–24).) Even if true, there is no evidence that this caused customers to breach their contractual relations, or to not enter into prospective contractual relations, with Plaintiffs.

In a false designation of origin claim, a plaintiff must show a likelihood of confusion between *trademarks*.[24] 15 U.S.C. § 1125(a)(1)(A). "Section 1125(a) provides a cause of action to plaintiffs who believe that another person's use of the same mark will likely cause confusion as to the affiliation of that person with the plaintiff." *MJ & Partners Restaurant Ltd. Partnership v. Zadikoff*, 10 F.Supp.2d 922, 926 (N.D.Ill.1998). "[A] plaintiff seeking to show trademark infringement under the Lanham Act must prove that there is a likelihood of confusion between the marks at issue." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 209 (3d Cir.1999) (en banc).

In a false advertising claim, a plaintiff must show, *inter alia*, false "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). Because the statute does not define the phrase "commercial advertising or promotion," "most courts have adopted [a] four-part test" to determine whether contested representations qualify. *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56 (2d Cir.2002). Under the test, the representations must be: (1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) disseminated sufficiently to the relevant purchasing public. *Id.* (citing cases) (adopting all but part two of the test); *see Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir.1999) (analyzing whether dissemination was sufficient to satisfy fourth part of the test); *Medical Graphics Corp. v. SensorMedics Corp.*, 872 F.Supp. 643, 650 (D.Minn.1994) (listing all four parts of test and applying fourth part).

Plaintiffs accuse DiverseyLever of violating § 1125(a) by telling some of their customers that the parties were "one and the same" company in a "concerted effort to confuse Plaintiffs' customers." (RFAC ¶ 271; Pls.' Resp. to Defs.' Mot. for Summ. J. at 54.) Although Plaintiffs assert that "there are facts in the record to support [their] claims," they only provide three record citations that even remotely support their assertions.[25] (*See* Pls.' Resp. to Defs.' Mot. for Summ. J. at 53, incorporating by reference 45–46, 54.) First, a DiverseyLever representative told an ACS–Minnesota customer, Khan's Mongolian Barbeque, that "we're the same account." (*Id.* at 45 (citing Cosgrove Decl. Ex. 62) (Malpass 7/24/03 Dep. Tr. at 195).) Second, a DiverseyLever representative told another ACS–Minnesota customer, Life Time Fitness, that it was the parent company of ACS–Minnesota and that it would be handling the billing. (*Id.* at 45) (citing Cosgrove Decl. Ex. 40 (Noel Decl. ¶ 4).) Because of this, "billing became confusing" for a time. (Cosgrove Decl. Ex. 40 (Noel Decl. ¶ 5).) Finally, a DiverseyLever rep-

---

24. "Proof of actual confusion is necessary for an award of damages. In order to obtain injunctive relief, proof of likelihood of confusion is required." *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 n. 5 (8th Cir.1990); *see* 3 *McCarthy on Trademarks and Unfair Competition* § 23:12 (4th ed.).

25. The Court reminds Plaintiffs that it "is not required to speculate on which portion of the record [they] rel[y], nor is it obligated to wade through and search the entire record for some specific facts that might support [their] claim." *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir.1990) (citations and internal quotations omitted). Rather, "[i]n resisting a properly supported motion for summary judgment, the plaintiff has an affirmative burden to designate specific facts creating a triable controversy". *Crossley v. Georgia–Pacific Corp.*, 355 F.3d 1112, 1113 (8th Cir.2004) (citation and internal quotation omitted). This reminder applies equally to all of Plaintiffs' claims considered herein.

resentative told an ACS–West Texas customer, Bennett's Barbeque of Englewood, Colorado, that it was ACS–Denver's parent company and that it could improve on the customer's contract. (Pls.' Resp. to Defs.' Mot. for Summ. J. at 46 (citing Cosgrove Decl. Ex. 41) (Huggins Decl. ¶ 3).)

 With respect to their false designation of origin claim, Plaintiffs' have failed generate a genuine issue of material fact as to a likelihood of confusion. First, DiverseyLever owned the Auto–Chlor trademark, while Plaintiffs were licensees. It seems plain there can be no confusion as to origin because DiverseyLever was the originator of the trademark. As one district court has observed:

> [O]ther courts have evaluated the likelihood-of-confusion issue in the context of trademark licensees. These cases suggest that a licensee of the right to distribute goods and services bearing a certain trademark cannot bring an action under § 1125(a) against a trademark owner and/or its affiliates for using the trademark in violation of the licensing agreement.

*MJ & Partners,* 10 F.Supp.2d at 927 (citations omitted). Indeed, "[w]hile a trademark licensee (at least if he has an exclusive license) ... can sue to protect the trademark from infringement ... he cannot sue the trademark owner for 'infringing' the trademark.... There is no basis in either the federal or the state law of unfair competition for such a claim." *Westowne Shoes, Inc. v. Brown Group, Inc.,* 104 F.3d 994, 997 (7th Cir.1997) (Posner, J.) Second, Defendants' conduct has really nothing to do with trademarks, which is, of course, the Lanham Act's realm of protection. Defendants are not accused of using a trademark that confuses customers as to the origin of Plaintiffs' products. Rather DiverseyLever's sales representatives are accused of telling customers that DiverseyLever was Plaintiffs' parent company in order to sell them DiverseyLever products—*not* Auto–Chlor trademarked products. Had DiverseyLever actually sold the customers Auto–Chlor trademarked products, then Plaintiffs would have a breach of contract claim. Third, and most importantly, Plaintiffs have not shown any likelihood of confusion. None of the customers identified in Plaintiffs' brief had any confusion whatsoever as to the source of the products they were purchasing. In sum, Plaintiffs' claims are simply not cognizable under a false designation of origin theory.

 Turning to Plaintiffs' false advertising claim, Defendants contend that the alleged representations are not "commercial advertising or promotion" because they were not disseminated sufficiently to the relevant purchasing market. (Defs.' Br. in Supp. of Mot. for Summ. J. at 45.) The Court agrees. Both sides cite the Second Circuit's observation that

> the touchstone of whether a defendant's actions may be considered "commercial advertising or promotion" under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement.

*Fashion Boutique,* 314 F.3d at 57. The conduct Plaintiffs have focused on in their moving papers, however, clearly does not fall within the boundaries of commercial advertising or promotion. There is no evidence that these statements were part of an organized campaign to penetrate the marketplace. The complained-of representations consist, at best,[26] of three state-

---

26. Malpass's testimony regarding the DiverseyLever representative's statement to the Khan's customer, is multiple hearsay—the

representative allegedly made this remark to the owner of Khan's, who then told the owner

ments by DiverseyLever representatives to three customers in a marketplace of hundreds of customers. Such evidence is insufficient to satisfy the requirement that representations be disseminated widely in order to constitute "commercial advertising or promotion" under the Lanham Act. *See Fashion Boutique*, 314 F.3d at 58 (finding a total of twenty-seven oral statements to customers out of a marketplace of thousands insufficient); *Medical Graphics*, 872 F.Supp. at 650 (finding statements made by one sales representative to one customer insufficient); *American Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F.Supp. 1072 (N.D.Ill.1993) (finding that a single letter did not constitute commercial advertising or promotion).

█ Accordingly, the Court will grant Defendants summary judgment on Plaintiffs' Lanham Act claims. In addition, the Court will also grant Defendants summary judgment on Plaintiffs' claims under the New Mexico Unfair Practices Act, Colorado Consumer Protection Act, and common law unfair competition. Plaintiffs have offered no argument as to why these claims should not share the fate of their Lanham Act claims. (*See* Pls.' Resp. to Defs.' Mot. for Summ. J. at 53–54.) Indeed, Plaintiffs devote *one sentence* out of a fifty-five page brief to these three theories. (*See id.* at 54.) There are no statutory or case law citations. (*See id.*) "Summary judgment should be granted ... when the nonmoving party fails to meet its burden to come forward with facts *and law* demonstrating

a basis for recovery that would support a jury verdict." *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 600 (5th Cir.2001) (emphasis added). Indeed, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. ... Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." [27] *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.1995) (citations omitted).

For similar reasons, the Court will also grant Defendants summary judgment on Plaintiffs' Minnesota Franchise Act claim. Generally, the Minnesota Franchise Act makes it an "unfair and inequitable practice," unless otherwise specified, to "terminate or cancel a franchise," "fail[ ] to renew a franchise," or "unreasonably withhold consent to an assignment, transfer, or sale of the franchise." Minn.Stat. § 80C.14, subds. 2–5. Plaintiffs have not generated a genuine issue of material fact of any such "unfair and inequitable practice" by Defendants. As a result of this determination, the Court will also deny Plaintiffs' Motion for Partial Summary Judgment with respect to their request for the Court to find that "a franchise relationship has existed between Plaintiffs and Defendants at all relevant times." (Pls.' Mem. of Law in Supp. of Mot. for Partial Summ. J. at 1.) Any necessity in

---

of ACS–Minnesota, who then told Malpass. (*See* Cosgrove Decl. Ex. 62 (Malpass 7/24/03 Dep. Tr. at 194–96).)

**27.** In any event, Plaintiffs' Colorado Consumer Protection Act claim fails because they have not shown Defendants' conduct to have had a "significant public impact" as required under the Colorado Act. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 149–150 (Colo.2003); *see United States Welding, Inc. v. Burroughs Corp.*, 615

F.Supp. 554, 555 (D.Colo.1985) ("[T]he Act is intended to reach practices of the type which affect consumers generally and is not available as an additional remedy to redress a purely private wrong." (citation omitted)). Similarly, Plaintiffs' New Mexico Unfair Practices Act claim fails because they have not shown that "the public was deceived as to the source of the product" as required under the New Mexico Act. *Thompson v. Youart*, 109 N.M. 572, 787 P.2d 1255, 1259 (1990) (citation omitted).

such a finding is rendered moot by the failure of their Minnesota Franchise Act claims.

## IV. Promissory Estoppel

▬▬▬ Finally, Plaintiffs assert numerous promissory estoppel claims. (Pls.' Resp. to Defs.' Mot. for Summ. J. on Pls.' Promissory Estoppel Claims at 1.) Promissory estoppel is explained as:

A promise which the promisor should reasonably expect to induce action forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Calabro v. Calabro,* 15 S.W.3d 873, 878 (Tenn.Ct.App.1999); *Amacher v. Brown–Forman Corp.,* 826 S.W.2d 480, 482 (Tenn. Ct.App.1991). Although Tennessee courts have not reached total agreement on when a promisor's words or actions satisfy a promissee's reliance, "the resulting promise must be unambiguous and not unenforceably vague." *Amacher,* 826 S.W.2d at 482 (citation omitted); *see Calabro,* 15 S.W.3d at 879, 879 n. 4. There are limits, however, to the application of promissory estoppel:

The limits of promissory estoppel are: (1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted reasonable in justifiable reliance on the promise as made.

*Calabro,* 15 S.W.3d at 879 (quoting *Alden v. Presley,* 637 S.W.2d 862, 864 (Tenn. 1982)). Consequently, "[t]he doctrine of promissory estoppel is also referred to as 'detrimental reliance' because the plaintiff must show not only that a promise was made, but also that the plaintiff reasonably relied on the promise to his detriment." *Id.* (citations omitted).

Defendants have challenged each of Plaintiffs' claims --- some 31 alleged promises made to all eight Plaintiffs (for a total of 248 promises)—on various grounds. (Defs.' Br. in Supp. of Summ. J. on Pls.' Promissory Estoppel Claims 1–2; *see* Gierke Decl. in Supp. of Defs.' Mot. for Summ. J. on Pls.' Promissory Estoppel Claims Ex. T.) Generally, they contend that none of Plaintiffs' alleged promises is enforceable and that none of Plaintiffs' actions or forbearance is actionable. (Defs.' Br. in Supp. of Summ. J. on Pls.' Promissory Estoppel Claims at 8.) Plaintiffs respond that Defendants promised "(1) to sell 'virtually at cost' the products they provide Plaintiffs for resale ...; (2) to respect Plaintiffs' exclusive rights in their territories ...; and (3) to support Plaintiffs' businesses, including by creating new products, assisting in marketing efforts, and coordinating the development of profitable national accounts...." (Pl.'s Resp. to Defs.' Mot. for Summ. J. on Pls.' Promissory Estoppel Claims at 1.) They relied on these alleged promises by (1) incurring "out-of-pocket expenses" for expanded office and storage space, additional personnel, and new trucks and equipment; and (2) passing up "more lucrative opportunities" by not "selling their businesses or shifting out of the Auto–Chlor brand." (*Id.* at 24–26.)

▬▬▬ Plaintiffs' promissory estoppel claims do not withstand close scrutiny. First, Plaintiffs argue that they incurred "out-of-pocket expenses" in reliance upon Defendants' alleged promises "to expand the profile of Auto–Chlor, in particular with respect to national accounts." (*Id.* at 25.) In support, Plaintiffs cite their "itemize[d] expenses" as detailed in Interrogatory Responses, Item 1 (*see* Brenner Decl.

Exs. 2–8 (Plaintiffs Answers to Interrogatory No. 1)) and the testimony of several dealer representatives (Pl.'s Resp. to Defs.' Mot. for Summ. J. on Pls.' Promissory Estoppel Claims at 25). According to the dealers' testimony, they incurred out-of-pocket expenses based upon "promises" of:

- "going to go national," "national accounts" and "national footprints" (Brenner Decl. in Supp. of Def.'s Mot. for Summ. J. on Promissory Estoppel Claims Ex. 10 (White/Stewart 4/1/04 Dep. Tr. at 34:21–37:25));
- "national company," "national accounts," and "national account exposure" (*id.* Ex. 11 (R. Durham 3/9/04 Dep. Tr. at 25:15, 38:5, 43:15–16));
- "national brand" and "going to grow" (*id.* Ex. 12 (Poole 3/10/04 Dep. Tr. at 343:8–14));
- "going to develop chain accounts and national accounts" (*id.* Ex. 14 (McPhail 3/9/04 Dep. Tr. at 509)).

These "promises," however, are unenforceably vague. *Amacher,* 826 S.W.2d at 482; *Calabro,* 15 S.W.3d at 879. In *Amacher,* the Tennessee Court of Appeals found that a promise made by a distillery to cattle farmers "to have a continuing supply of thick stillage" to feed their animals was unenforceably vague because "[o]ne must ask, 'In what quantities?' and 'For how long?' and 'At what price?'" 826 S.W.2d at 482. "Without these essential terms," the Court observed, it "cannot determine whether any injustice will occur" if the distillery curtailed its stillage production. *Id.* Similarly, in this case the Court must ask, "What is a national account?" and "What is a national footprint?" and "When must Defendants obtain these accounts?" and "How many?" Without these terms, this Court cannot determine whether any injustice will occur to Plaintiffs.

■ Furthermore, Plaintiffs have not shown their reliance to be justifiable. *See Calabro,* 15 S.W.3d at 879 (identifying as one of the limits of promissory estoppel that "the promisee must have acted reasonable in justifiable reliance on the promise as made"). Plaintiffs knew that to obtain national accounts ACS would have to be expanded to enough territories so that, as an ACS–Denver representative put it, they would be able to say to a customer "everywhere you are, we are." (Brenner Decl. in Supp. of Defs.' Mot. for Summ. J. on Pls.' Promissory Estoppel Claims Ex. 10 (White/Stewart 4/1/04 Dep. Tr. at 168); *see id.* Exs. 9 (Merrifield/Buser 3/9/04 Dep. Tr. at 84–85); 13 (Vertin 3/10/04 Dep. Tr. at 73).) But Plaintiffs had no idea how long this expansion would take. (*Id.* Exs. 9 (Merrifield/Buser 3/9/04 Dep. Tr. at 86); 12 (Poole 3/11/04 Dep. Tr. at 401); 14 (McPhail 3/9/04 Dep. Tr. at 578).) Nevertheless, Plaintiffs incurred their out-of-pocket expenses.[28] What makes it even more unjustifiable is that Plaintiffs incurred these expenses without first agreeing as to how they would share the national accounts. (*Id.* Exs. 9 (Merrifield/Buser 3/9/04 Dep. Tr. at 86); 10 (White/Stewart 4/1/04 Dep. Tr. at 181); 11 (R. Durham 4/2/04 Dep. Tr. at 223–24); 12 (Poole 3/11/04 Dep. Tr. at 529); 13 (Vertin 3/10/04 Dep. Tr. at 76); 14 (McPhail 3/9/04 Dep. Tr. at 592, McPhail 3/10/04 Dep. Tr. at 741).) In light of these facts, no reasonable jury could find Plaintiffs' reliance on Defendants' alleged promises of "national accounts" justified.

---

**28.** Over time, ACS has been expanded to Boston, Philadelphia, Pittsburgh, Cincinnati, Las Vegas, Chicago, Cleveland, Baltimore, and Omaha. (Brenner Decl. in Supp. of Def.'s Mot. for Summ. J. on Promissory Estoppel Claims Exs. 9 (Merrifield/Buser 3/9/04 Dep. Tr. at 92); 10 (White/Stewart 4/1/04 Dep. Tr. at 172–74).)

Second, Plaintiffs argue that they did not sell their businesses in reliance on a variety of other promises. (Pl.'s Resp. to Defs.' Mot. for Summ. J. on Pls.' Promissory Estoppel Claims at 26.) The Court need not go into detail about these alleged promises because Plaintiffs have not shown detrimental reliance. To start, no dealer considered selling its business but then decided not to sell on account of any promises made by Defendants. (*See* Brenner Decl. in Supp. of Def.'s Mot. for Summ. J. on Promissory Estoppel Claims Exs. 9 (Merrifield/Buser 3/9/04 Dep. Tr. at 14:18–17:11, 18:7–21); 10 (White/Stewart 4/1/04 Dep. Tr. at 20:4–24:6); 11 (R. Durham 3/9/04 Dep. Tr. at 17:18–18:1); 12 (Poole 3/10/04 Dep. Tr. at 324:2–8, 327:3–5); 13 (Vertin 3/9/04 Dep. Tr. at 58:15–60:15); 14 (McPhail 3/9/04 Dep. Tr. at 501:5–10, 505:2–5).) What's more, Plaintiffs have offered no evidence of when, to whom, or for how much they would have sold. While this Court previously granted Plaintiffs' Motion to Amend the Complaint to Add a Claim for Promissory Estoppel in the face of Defendants' challenge that, *inter alia,* Plaintiffs did not allege reliance, *Auto–Chlor System of Minnesota, Inc., et al. v. DiverseyLever, et al,* Civ. No. 02–535, Report and Recommendation at 9–10 (D.Minn. Jan. 9, 2004), *adopted* (D.Minn. Feb. 17, 2004) (Kyle, J.), it is clear now at the end of discovery that Plaintiffs' assertions about foregoing "other options" and not selling their businesses are disingenuous, factually unsupported, and ultimately boils down to rank speculation, *see Howell v. Aluminum Co. of Am.,* 8 F.Supp.2d, 1012, 1021–22 (E.D.Tenn.1997) (rejecting promissory estoppel claim where evidence that plaintiff "did forgo other business opportunities" was "nonexistent in this record" and plaintiff's "claim for damages for income which he did not realize ... rests on pure speculation.").

Moreover, it cannot be said under the circumstances of this case that by not selling their businesses Plaintiffs "relied on the promise to [their] detriment." *Calabro,* 15 S.W.3d at 879. Nothing in the record shows that it has been to Plaintiffs' detriment to be in business as an ACS dealer and Plaintiffs have cited no case law to the contrary. Rather, "the detriment suffered in reliance must be substantial in an economic sense," *id,* and although Plaintiffs paid a percentage of their sales to Defendants, they have also profited from the venture. In sum, the Court cannot say that "injustice can be avoided only by enforcement of the promise[s]" that allegedly caused Plaintiffs to remain dealers. *Id.* at 878; *see also Piantes v. Pepperidge Farm, Inc.,* 875 F.Supp. 929, 935 (D.Mass.1995) (holding that "enforcement of the promise is not necessary to prevent injustice" because "[t]here is no question that [plaintiff] has benefited tremendously from his purported reliance").

### Conclusion

Based on the foregoing, and all of the files, records, and proceedings herein, **IT IS ORDERED**:

1. Defendants' Motions for Summary Judgment (Doc. Nos.279, 324) are **GRANTED** in part and **DENIED** in part:

 a. The following Claims of Plaintiffs' Revised Fourth Amended Complaint (Doc. No. 209) are **DISMISSED WITH PREJUDICE**:

 i. Claim III (tortious interference with contractual relations);

 ii. Claim IV (tortious interference with prospective business relations);

 iii. Claim V (violation of the Minnesota Franchise Act, Minn. Stat. § 80C.01 *et seq.*);

 iv. Claim VI (violation of the Colorado Consumer Protection Act);

 v. Claim VII (violation of the New Mexico Unfair Practices Act);

vi. Claim VIII (statutory inducement of breach of contract in violation of Tenn. Stat. § 47–50–109);

vii. Claim IX (promissory estoppel);

viii. Claim X (common law unfair competition); and

ix. Claim XI (false designation of origin, false description and palming off in violation of the Lanham Act, 15 U.S.C. § 1125).

b. The following Claims will proceed to *Trial:*

i. Claim I (breach of contract with respect to Plaintiffs' overcharging claims);

ii. Claim II (breach of the implied covenant of good faith and fair dealing with respect to Plaintiffs' overcharging claims);

iii. Claim XII (to the extent declaratory relief is appropriate on Plaintiffs' Claims I and II); and

iv. Claim XII (to the extent injunctive relief is appropriate on Plaintiffs Claims I and II).

2. Defendant DLever's Motion for Partial Summary Judgment (Doc. No. 240) is **GRANTED;** and

3. Plaintiffs' Motion for Partial Summary Judgment (Doc. No. 237) is **DENIED.**